UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY,<br><br>Defendant. | Civil Action No. 05 CV 11827-RWZ |

MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE
UNITED STATES SEEKING ENTRY OF CONSENT DECREE

On September 8, 2005, the United States of America ("United States") filed the above-

captioned action against the Massachusetts Bay Transportation Authority ("MBTA").  The

complaint alleges that the MBTA is liable, pursuant to Section 107(a) of the Comprehensive

Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a),

for response costs incurred by the United States in connection with the Morses Pond Culvert

Superfund Site ("Site") located in Wellesley, Massachusetts.  On the day the complaint was

filed, the United States lodged with the Court a proposed Consent Decree ("Decree") that

resolves the action.

On September 22, 2005, the United States published a notice in the Federal Register

indicating that the public could comment on the Decree for a period of 30 days. 70 Fed. Reg.

55627.  On October 24, 2005, American Premier Underwriters, Inc. ("APU"), another

potentially responsible party ("PRP") at the Site, submitted comments objecting to the Decree

("APU Comments").[1] Exhibit ("Ex.") 1. The United States has considered APU's comments and has determined, for the reasons discussed in Section III.B below, as well as in the Environmental Protection Agency's Responsiveness Summary ("EPA Responsiveness Summary") attached hereto as Ex. 2, that the comments fail to show that the Decree is inappropriate, inadequate, or improper. The United States therefore requests that the Court enter the Decree.

I. BACKGROUND

    A. The CERCLA Enforcement Program

    Congress enacted CERCLA in response to widespread concern over the severe environmental and public health effects resulting from the improper disposal of hazardous substances. See Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1078 (1st Cir. 1986). CERCLA empowers the Executive Branch of the federal government with broad authority to clean up hazardous waste sites. In this case, that authority has been delegated to the United States Environmental Protection Agency ("EPA").

---

[1] On November 1, 2005, the United States filed an action against APU under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking to recover the costs incurred by the United States in connection with the Site. United States v. American Premier Underwriters, Inc., No. 05 CV 12189 RWZ. The complaint alleges that APU is liable at the Site because APU (or one of its predecessors) was the owner and/or operator of the Site at the time that the hazardous substances were disposed of at the Site. On January 6, 2006, APU filed a motion to dismiss the United States's claims, asserting that the claims are barred by the statute of limitations and that the case should be referred to the United States District Court for the Eastern District of Pennsylvania to determine whether the United States's claims are barred by APU's bankruptcy discharge. On February 15, 2006, the United States filed a memorandum in opposition to APU's motion to dismiss and in support of the United States's cross-motion for summary judgment on the statute of limitations issue.

Sections 104(a) and (b) of CERCLA, 42 U.S.C. § 9604(a) and (b), authorize EPA to use Superfund monies to investigate the nature and extent of hazardous substance releases from hazardous waste sites and to clean up those sites.  Replenishment of expended Superfund monies is crucial to the continuing availability of funds for future cleanups.  Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), permits the United States to recover its costs of responding to releases of hazardous substances from PRPs.  Pursuant to Section 107(a), the United States may recover response costs from current owners and operators of Superfund sites, from past owners and operators of Superfund sites at the time of the disposal of hazardous substances at the sites, and from generators and transporters of hazardous substances sent to Superfund sites.  See United States v. Monsanto, 858 F.2d 160, 168-171 (4th Cir. 1988).

Congress, in 1986, added a provision to CERCLA that provides contribution protection for persons that enter into consent agreements.  Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), provides that a person who has resolved its liability to the United States in a judicially approved settlement "shall not be liable for claims for contribution regarding matters addressed in the settlement."  Congress decided to give settlors contribution protection in order to encourage PRPs to settle their CERCLA liability.  Without this protection, PRPs would have less incentive to settle due to the prospect of being faced with subsequent protracted contribution litigation.  See In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution, 712 F.Supp. 1019, 1026-1027 (D. Mass. 1989).

B.  The Site

The Site is located in Wellesley, Massachusetts.  The Site includes the following areas: the railroad embankment located in the vicinity of the culvert at the south end of Morses Pond,

- 3 -

the cove at the south end of Morses Pond, the 192-foot culvert that allows water to flow from the

South end of Morses Pond to the north end of Paintshop Pond (under the railroad tracks and

Central Street), property adjacent to the cove at the south end of Morses Pond, and a residential

property located at One Bacon Street.  The Site is abutted to the north by the remainder of

Morses Pond, to the south by railroad tracks and Paintshop Pond, to the northeast by a

recreational town beach, to the east by undeveloped land, and to the west by Bacon Street.[2] EPA

Responsiveness Summary at 2, Ex. 2.

The MBTA currently owns the railroad embankment as well as a small portion of Morses

Pond located adjacent to the northern end of the culvert.  See Partial Topographic Survey

Morse's Pond, prepared by LANDTECH, dated 12/29/00 ("Landtech Survey"), Ex. 8.[3]  The

MBTA acquired this property on January 17, 1973, when it purchased the property from the

Penn Central Transportation Company ("PCTC") in connection with PCTC's bankruptcy

proceeding.  March 16, 2000 MBTA Information Request Response at Response 8, Ex. 11; Deed

from Trustees of Penn Central Transportation Company to MBTA dated January 17, 1973, Ex.

12.  (In 1994, PCTC changed its name to American Premier Underwriters, Inc.).  The Town of

Wellesley owns a portion of the shoreline of Morses Pond in the vicinity of the culvert, a portion

of the pond itself, and the dam located at the outlet of the culvert where water drains into

Paintshop Pond.  Landtech Survey, Ex. 8.  The Bacon Street Realty Trust owns the residential

property located to the west of the culvert.  Id.

---

[2]  Maps showing the location of the Site are attached hereto as Exs. 3 - 5.   A cross-section of the
railroad embankment at the Site, which shows a cross-section of the culvert, is attached hereto as
Ex. 6.  Several photographs of the Site, taken during the EPA removal action, are attached hereto
as Ex. 7.

[3] Ex. 8 can best be reviewed if it is magnified on the computer screen.

In 1994, the Massachusetts Department of Environmental Protection ("MADEP") discovered that the Site was contaminated with extremely high levels of chromium, including hexavalent chromium.   In 1996, MADEP installed a perimeter fence and "No Trespassing" signs.  In 1998, MADEP placed a geotextile fabric on the Site and installed monitoring wells. EPA Responsiveness Summary at 3, Ex. 2.

EPA conducted a CERCLA removal action at the Site from 2000 - 2002 which included (a) soil testing, (b) installation of a coffer dam, 24 dewatering wells, and a bypass pumping system to drain water from the cove in Morses Pond and the culvert, (c) excavation and off-Site disposal of contaminated sediment located in the cove and culvert, (d) construction of sheet piling to retain the railroad embankment, (e) excavation and off-Site disposal of contaminated soils located in the railroad embankment and surrounding area, (f) in-situ treatment of contaminated soil in the railroad embankment located at a depth below four feet, (g) installation of a cap in the railroad embankment excavation area, and (h) Site restoration.   The total cost of the removal action was about $4 million.  EPA Responsiveness Summary at 3, Ex. 2.

The highest levels of chromium contamination at the Site were found in material that was physically a part of the railroad embankment that supports the railroad line.  EPA Responsiveness Summary at 2, 4, Ex. 2.  From 600 - 800 tons of contaminated material was removed by EPA from the railroad embankment and a substantial amount of contaminated material was left in place in the railroad embankment due to engineering concerns about the structural integrity of the railroad line.  Id.  A railroad line has run by the shore of Morses Pond, where the Site is located, since 1835.  April 25, 2002 APU Information Request Response at Responses 5 and 9, Ex. 9.  APU itself, or its predecessor railroad companies, owned and/or

operated this railroad line from 1835 until January 17, 1973, when the Penn Central

Transportation Company sold this portion of the railroad line to the MBTA.  Id.  The United

States has alleged, in United States v. American Premier Underwriters, Inc., No. 05-CV-12189

RWZ, that fill material containing hazardous substances was placed at the Site during the 1890's,

or possibly at some point in time thereafter (but before January 17, 1973), and that APU (or one

of its predecessors) was the owner/operator of the Site at the time of the disposal.

II. <u>TERMS OF THE DECREE</u>

The Decree requires the MBTA to pay the United States $150,000, plus interest on that

amount running from May 5, 2005, within 30 days of the Court's entry of the Decree.  Decree ¶¶

5 - 6.  In exchange for this payment, the United States has provided the MBTA with a covenant

not to sue under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), with respect to the recovery

of Past Response Costs.  Decree ¶ 15.  Past Response Costs are defined to include all costs

incurred by EPA or the Department of Justice, at or in connection with the Site, through the date

of entry of the Decree.  Decree ¶ 3.  Under the Decree, the MBTA will also receive "contribution

protection" under Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), with respect to any

action seeking contribution with respect to Past Response Costs.  Decree ¶ 21.

III. <u>ARGUMENT</u>

     A.      The Court Should Approve the Decree Because it is Fair,
                      <u>Reasonable, and in the Public Interest</u>

Approval of a consent decree is a judicial act committed to the informed discretion of the

Court.  United States v. Cannons Eng'g Corp., 720 F.Supp. 1027, 1035 (D. Mass 1989), aff'd 899

F.2d 79 (1st Cir. 1990).  Judicial review of a settlement negotiated by the United States is

subject to special deference; the Court should not engage in "second-guessing the Executive

- 6 -

Branch." United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990). In determining

whether to enter a CERCLA settlement, the Court must determine whether the settlement is fair,

reasonable, and consistent with the purposes of CERCLA. See United States v. Charles George

Trucking, Inc., 34 F.3d 1081, 1084 (1st Cir. 1994); Cannons, 899 F.2d at 85. As discussed

below, the Court should approve the Decree because (1) the MBTA is paying an amount that is

appropriate given its activities at the Site and (2) the United States would have faced litigation

risk had it sought to litigate its claim against the MBTA.

### 1. The MBTA is Paying an Appropriate Amount

The settlement should be approved because the MBTA is paying an amount that is

appropriate considering its activities at the Site. The United States believes that the disposal of

hazardous substances took place at the Site during the 1890's, or at some point in time thereafter,

but prior to January 17, 1973, when the MBTA purchased the Site. During that period of time,

APU (or one of its predecessors in interest) owned and/or operated the railroad embankment at

the Site. The $150,000 payment by the MBTA is appropriate because the MBTA was not itself

involved in the disposal of hazardous substances at the Site. Determination of the appropriate

payment amount in settlement of a PRP's liability at a site "should be left largely to the EPA's

expertise" and should be upheld unless "it is arbitrary, capricious, and devoid of a rational

basis." Cannons, 899 F.2d at 87.[4]

---

[4] The fairness of a CERCLA settlement involves both procedural fairness and substantive fairness. Cannons, 899 F.2d at 86 - 88. To measure procedural fairness, the Court "should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." Id. at 86. APU has not challenged the "procedural" fairness of the Decree. Nor could it. The negotiation of the Decree was procedurally fair because it was negotiated at arm's length and the MBTA was represented by experienced counsel.

2. Litigation Risk

In agreeing to this settlement, the United States has also taken into account potential litigation risk associated with its case against the MBTA. Although CERCLA does impose liability upon the current owners of Superfund sites, such as the MBTA, see Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), a landowner can avoid liability, based on CERCLA's "innocent landowner" defense, if it can show that the hazardous substances were disposed of prior to the time it acquired the property and that it did not know or have reason to know of the prior contamination at the time it acquired the property. See Section 101(35)(A) of CERCLA, 42 U.S.C. § 9601(35)(A); United States v. DiBiase, 45 F.3d 541, 545 (1st Cir. 1995); United States v. Shell Oil Co., 841 F.Supp. 962, 973 - 74 (C.D. Cal. 1993); HRW Systems, Inc. v. Washington Gas Light Co., 823 F.Supp. 318, 346 - 48 (D. Md. 1993).[5]

In view of this "innocent landowner" defense, the United States would face litigation risk if it chose to judicially pursue the MBTA to a judgment. The MBTA has taken the position that the disposal of the hazardous substances at the Site took place before it acquired the property. The MBTA further represents that no construction work has taken place on the lower portion of the railroad embankment, where the contamination was located, since it acquired ownership of the Site in 1973. March 16, 2000 MBTA Section 104(e) Response at Response 9, Ex. 11.[6] Moreover, the entities that have been responsible for track maintenance, since 1976, represent

---

[5] A landowner also has to show that it exercised due care with respect to the hazardous substances, and that it provided cooperation, assistance and access to the persons authorized to implement response actions at the Site. See Section 101(35)(A) of CERCLA, 42 U.S.C. § 9601(35)(A).

[6] In the Decree, the MBTA certifies that it fully complied with all EPA information requests related to the Site. Decree ¶ 33.

that they have only implemented tie replacement and resurfacing projects, which did not involve

construction work at the lower portion of the railroad embankment.  April 19, 2000 CSX

Information Request Response at Ans. 9, Ex. 10; March 16, 2000 MBTA Information Request

Response at Response 9, Ex. 11.  Moreover, EPA is not aware of any information indicating that

any entity has used the Site as a dump for waste material at any time since the MBTA acquired

the property.  In addition, the fact that more than  600 - 800 tons of contaminated material was

located in and was structurally a part of the railroad embankment itself indicates that

contaminated material was not simply dumped by a third-party on an uncontaminated railroad

embankment since the MBTA acquired the property in 1973 (or, for that matter, at any time prior

to the MBTA's acquisition of the property).  EPA Responsiveness Summary at 6, Ex. 2.

       The MBTA has also taken the position that it could establish that it did not know, or have

reason to know, of the contamination at the time it acquired the property.  The MBTA claims it

had no knowledge of the contamination until about 1994, when it was informed by MADEP that

contamination had been discovered at the Site.  March 16, 2000 MBTA Information Request

Response at Response 15, Ex. 11.  The MBTA also asserts that it had no "reason to know" of the

contamination at the time it purchased the property because (1) it acquired about 145 miles of

track and associated property, (2) the acquisition was made in 1973, when environmental

property assessments were less sophisticated and less common, and (3) the Site had not been

used for any industrial operations (other than the railroad itself).

       In sum, in reaching a settlement with the MBTA, the United States appropriately

considered the litigation risk posed by the "innocent landowner defense" if it pursued its Section

107 cost recovery claim against the MBTA to judgment.  See United States v. Davis, 261 F.3d 1,

26 (1st Cir. 2001); United States v. Charter Int'l Oil Co., 83 F.3d 510, (1st Cir. 1995) (approving

$215,000 settlement where total claim was $4 million due, in part, to litigation risk); Cannons,

889 F.2d at 90.

      B.     The Comments Submitted by APU Fail to Show that the Decree is Unfair, Unreasonable, or Inconsistent with the Purposes of CERCLA

APU has submitted comments to the Department of Justice contending that the Decree is

arbitrary and capricious.  Ex. 1.  APU asserts that (a) EPA did not conduct a sufficient

investigation of the facts or law related to the liability of the various PRPs at the Site, (b) EPA

did not equitably allocate responsibility among such PRPs for the contamination, and (c) EPA

agreed to accept a $150,000 settlement payment from the MBTA but refused to settle with APU

for a larger amount, even though APU has equal or better defenses than the MBTA.  APU

Comments at 2, Ex. 1.  The United States considered APU's arguments and, for the reasons

discussed below, as well as those set forth in EPA's Responsiveness Summary, sees no basis

indicating that the Decree is inappropriate, inadequate, or improper.

      1.    EPA Conducted a Sufficient Investigation

APU asserts that EPA has not conducted a sufficient investigation of the facts or law

related to the liability of the various PRPs at the Site.  APU is incorrect.  In order to settle a

CERCLA claim, EPA need not first engage in years of litigation or pre-litigation fact-finding.

Any such requirement would eviscerate one of the main purposes of settlement, which is to

avoid the transaction costs related to litigation.  See Acushnet, 712 F. Supp. at 1027 (key purpose

of settlement is to avoid litigation costs).   Moreover, the United States is not required to justify

its settlements with precise allocations of liability.  See Davis, 261 F.3d at 24; Charles George

Trucking, 34 F.3d at 1088.

In any event, the United States obtained a significant amount of information related to the Site and the liability of the PRPs at the Site. EPA's investigation of the current and past owners of the Site was appropriate at this Site.[7] EPA issued information requests to six parties under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), including information requests sent to the MBTA and APU. EPA Responsiveness Summary at 5, Ex. 2. EPA received a significant amount of information in response to these information requests. Id. In addition, the United States obtained information from other sources, such as historical information from local libraries and the Registry of Deeds. Id.

In sum, the United States's efforts to obtain information related to the Site resulted in sufficient information to enter into the MBTA settlement and the United States should not be required to obtain additional information through litigation or otherwise. To delay the MBTA settlement in order to obtain more information would run counter to Congress's intent to encourage early CERCLA settlements. See Cannons, 899 F.2d at 88.

    2. EPA Is Not Required to Prepare An Equitable Allocation of the Liability of all of the PRPs at the Site

APU next asserts that EPA should be precluded from entering into a settlement with the MBTA because it has not prepared an equitable allocation of the liability of all of the PRPs at the Site. APU is mistaken. As discussed above, in determining the appropriate settlement amount for the MBTA, the United States, in addition to considering litigation risk, also considered other relevant information. In particular, the available evidence indicates that the MBTA acquired its

---

[7] Given the physical nature of the Site, a railroad embankment and adjacent property, it was appropriate for EPA to focus its investigation on the past and current landowners, as it is unlikely that other parties might be involved as, for example, is the case with a hazardous waste landfill.

property after the disposal of hazardous substances on the property and that, in contrast, APU (or one of its predecessors) was the owner and/or operator of the property at the time that the hazardous substances were placed on the property.  See EPA Responsiveness Summary at 6, Ex. 2.  APU is the only PRP at the Site that was an owner/operator of the Site at the time of the disposal of hazardous substances at the Site.  See Id.   Given these equitable factors, the settlement with the MBTA is appropriate.

Moreover, EPA was not required to prepare a precise allocation amongst the various PRPs at the Site.   Rather, EPA's general consideration of litigation risk and other relevant information  is sufficient.   In fact, EPA is not required by law to prepare allocations of liability at Superfund sites, even at sites, unlike this one, where such "percentage" allocations can be prepared based on waste-in lists or similar evidence.[9]   EPA Responsiveness Summary at 6 - 7, Ex. 2.

Clearly, the United States has a "plausible explanation" for this $150,000 settlement with the MBTA.  The Court need look no further into the matter.  See Cannons, 899 F.2d at 87.

> 3.  The Settlement Should be Approved Even Though the United States Refuses to Settle with APU for a Similar Amount

Finally, APU contends that the Court should disapprove the MBTA settlement because the United States rejected a settlement offer from APU that was for more than $150,000 even though, according to APU, the United States's claim against APU is weaker than its claim against the MBTA.  The Court should reject this argument as well.  The fact that the United

---

[9] In settlements where PRPs are agreeing to implement a remedial action, CERCLA provides that EPA "may . . . provide a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible parties at the facility." Section 122(e)(3)(A), 42 U.S.C. § 9622(e)(3)(A) (emphasis added).   There is no requirement that the United States prepare such an allocation.

States refuses to settle with APU for an amount that is greater than $150,000 provides no basis

for the Court to reject the United States's settlement with the MBTA.  For the reasons discussed

above, the MBTA settlement is appropriate based on the strength of EPA's claim against the

MBTA.  In fact, APU concedes that the United States would have faced litigation risk in pursing

its case against the MBTA.  APU states that "due to the lack of evidence against MBTA, EPA

might not be able to recover a substantial portion of its past response costs from MBTA if the

Consent Decree is not approved."  APU Comments at 7, Ex. 1.

     The gist of APU's argument is not that the MBTA is paying too little, but rather that the

United States should be required to settle with APU on terms similar to the MBTA settlement.

But APU's view that it should also be able to settle for $150,000 is not a basis for the Court to

reject the settlement with the MBTA.  Whether to settle or litigate its case against APU is a

matter within the discretion of the Department of Justice.   See United States v. Hercules, Inc.,

961 F.2d 796, 798 (8th Cir. 1992).  There is no reason to believe that the United States is not

appropriately exercising its discretion in this matter.   Moreover, in determining whether to enter

the MBTA Decree, the Court should focus on whether the United States would face litigation

risk if it litigated its case against the MBTA, not on whether the United States will face litigation

risk in connection with its claim against APU.

     In any event, the United States disagrees with APU's premise that the United States does

not have a strong claim against APU.  The United States believes that it will be able to prove the

allegations of the complaint that it filed against APU in November, 2005, i.e., that APU or a

predecessor of APU was the owner and/or operator of the Site at the time of the disposal of

hazardous substances at the Site and that APU is therefore liable under CERCLA under Section

107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).   The United States, however, is not required to

litigate its case against APU in <u>this</u> proceeding, as any such litigation would involve precisely the type of in-depth factual analysis that the courts are to eschew when determining whether to enter a consent decree.  See <u>United States v. Acton Corp.</u>, 733 F.Supp. 869, 871 - 72 (D.N.J. 1990).   Therefore, the United States does not intend to respond to the laundry list of arguments set forth by APU at pages 4 - 5 of its comments concerning why, in APU's view, the United States will not be able to establish APU's liability.  Whether the United States can establish APU's liability will be decided, in due course, in connection with the action that the United States has filed against APU.[9]

      C.  <u>The Court Should Not Hold an Evidentiary Hearing</u>

The Court should not hold an evidentiary hearing in this matter, especially since it involves a monetary settlement.  <u>Charles George Trucking</u>, 34 F.3d at 1085 - 86; <u>Cannons</u>, 899 F.2d at 93 - 94; <u>Acushnet</u>, 712 F. Supp. at 1031 n. 21.  See <u>also</u> <u>United States v. Communidades Unidas Contra La Contaminacion</u>, 204 F.3d 275, 278 - 79 (1st Cir. 2000) (evidentiary hearing rejected even where settlement concerned health hazards and future protection of the environment).   "Requiring hearings to review the reasonableness of CERCLA consent decrees as a matter of course would frustrate the statutory objective of expeditious settlement. Consequently, requests for evidentiary hearings are, for the most part, routinely denied - and properly so - at the consent decree stage in environmental cases."  <u>Charles George Trucking</u>, 34 F.3d at 1085 (citations omitted).   And, as this Court noted in a CERCLA case involving a natural resource damages settlement being challenged by non-settling PRPs:

---

[9] APU's argument proves too much.  If APU is correct, and the United States is ultimately unable to establish APU's liability, then APU will have no reason to be concerned about the contribution protection that will be obtained by the MTBA.   See <u>United States v. Acton</u>, 733 F. Supp. at 873.

[An evidentiary hearing] would amount to a trial on the merits in terms of the time and expense involved.  Such a hearing is impractical given the facts in dispute and is not required by precedent or policy. . . [T]o grant inevitably lengthy hearings in cases such as this would either frustrate the express intent of Congress to encourage settlement or negate the benefits of any settlement that resulted. This Court does not require a factual presentation to support every settlement reached by a government agency.

Acushnet, 712 F. Supp. at 1031 n. 21.

CONCLUSION

For the reasons stated above, the Court should enter the Decree.

Respectfully submitted,

FOR THE UNITED STATES


SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division
Department of Justice

/s/ Donald G. Frankel
DONALD G. FRANKEL
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
Department of Justice
One Gateway Center, Suite 616
Newton, MA 02458
(617) 450-0442

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

BARBARA HEALY SMITH
Assistant United States Attorney
United States Attorney's Office
U.S. Courthouse
One Courthouse Way
Suite 9200
Boston, MA 02210


OF COUNSEL:

GREG DAIN
Senior Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Suite 1100
Boston, MA 02203

<u>CERTIFICATE OF SERVICE</u>

     I, Donald G. Frankel, hereby certify that, on March 3, 2006, the foregoing was filed through the ECF system and therefore was electronically sent to the registered participants identified on the Notice of Electronic Filing and that paper copies will be sent via first-class mail to those persons (if any) listed as non-registered participants, as well as the persons listed below.

Julie Taylor
Noble & Wickersham, LLP
1280 Massachusetts Avenue
Cambridge, MA 02138

                              /s/ Donald G. Frankel

## EXHIBITS TO MEMORANDUM

1.    October 24, 2005 Comments of APU Submitted to Department of Justice Concerning Consent Decree with MBTA (this exhibit has been broken into several parts)

2.    EPA Responsiveness Summary

3.    Map of Site Prepared by Weston Solutions, Inc. dated 6/4/02

4.    Map of Site Prepared by ROUX Associates

5.    Map of Site Prepared by Weston Solutions, Inc. dated 6/4/02

6.    Cross-Section of Culvert Prepared by IT Corporation dated 7/31/00

7.    Various Photographs of Site Taken Prior to or During EPA's Removal Action

8.    Partial Topographic Survey Morse's Pond, prepared by LANDTECH, dated 12/29/00 (this exhibit should be magnified on computer screen to achieve greater legibility)

9.    April 25, 2002 APU Information Request Response (relevant portions)

10.   April 19, 2000 CSX Information Request Response (relevant portions)

11.   March 16, 2000 MBTA Information Request Response (relevant portions)

12.   Deed from Trustees of Penn Central Transportation Company to MBTA dated January 17, 1973 (relevant portions).

# Exhibit 1

*FRANCEL*



**BLANK ROME** LLP
COUNSELORS AT LAW

| | |
|---|---|
| *Phone:* | *(215) 569-5689* |
| *Fax:* | *(215) 832-5689* |
| *Email:* | *stonelake@blankrome.com* |

October 24, 2005

**VIA HAND DELIVERY**

Assistant Attorney General
Environmental and Natural Resources Division
Post office Box 7611
United States Department of Justice
Washington, DC 20044-7611

> **Re:   United States v. Massachusetts Bay Transportation Authority**
> **DOJ Ref. 90-11-3-07035/2**

**COMMENTS ON PROPOSED CONSENT DECREE BETWEEN
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY & EPA
SUBMITTED ON BEHALF OF
AMERICAN PREMIER UNDERWRITERS, INC.**

American Premier Underwriters, Inc. ("APU") hereby submits the following comments through its undersigned attorneys in response to the proposed consent decree between Massachusetts Bay Transportation Authority ("MBTA") and the United States Environmental Protection Agency ("EPA"), which was lodged with the United States District Court for the District of Massachusetts, on September 8, 2005.

A notice of this proposed consent decree was published in the Federal Register on September 22, 2005. The notice invited interested parties to submit written comments within thirty (30) days. Since the thirtieth day of the comment period was Saturday, October 22, 2005, we are submitting these comments on behalf of APU on the first business day following that date.

**I.      Statement of APU's Position**

On September 8, 2005, the United States of America, on behalf of the Administrator of the EPA, filed a complaint against MBTA in the United States District Court for the District of

90-11-3-07035/2

OCT 2 5 2005

Washington, DC

071820.07608/11478682v.1 ••• Florida  •  Maryland  •  New Jersey  •  New York  •  Ohio  •  Pennsylvania

**BLANK** ▪ **ROME** ᴸᴸᴾ
COUNSELORS AT LAW

Asistant Attorney General
October 24, 2005
Page 2

Massachusetts (the "Complaint") alleging violations of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, as amended ("CERCLA"), seeking reimbursement of response costs incurred or to be incurred for response actions taken or to be taken at or in connection with the release of hazardous substances at the Morses Pond Culvert Superfund Site in the Town of Wellesley, Massachusetts (the "Site"). At the same time the Complaint was filed, EPA, together with MBTA, lodged a proposed consent decree (the "Consent Decree"), which if approved by the Court would give a covenant not to sue by EPA to MBTA for all past response costs incurred by EPA in its cleanup of lead and chromium contamination at the Site in exchange for MBTA's payment to EPA of $150,000.00. Moreover, the Consent Decree would also provide to MBTA protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for "matters addressed" in the Consent Decree.

EPA's proposal to enter this Consent Decree is arbitrary and capricious, an abuse of discretion and inconsistent with the public interest and the provisions of Section 122 of CERCLA because, among other things: (1) EPA has not conducted an appropriate investigation of the facts and law applicable to identification of potentially responsible parties ("PRPs") for the subject contamination at this Site under CERCLA; (2) EPA has not established an equitable allocation of responsibility among such PRPs for such contamination; and (3) without performing either of the foregoing tasks, it proposes to settle all claims against one PRP and grant contribution protection to that PRP in exchange for a smaller payment than EPA rejected from another PRP that has equal or better defenses to the same claims.

MBTA is not the only party from which EPA has demanded payment of its past response costs at this Site. EPA has also demanded these costs from APU. Specifically, EPA has demanded more than $4 million in past response costs from APU. APU denies that it is liable for EPA's response costs, but, in an attempt to compromise EPA's disputed claim without litigation, APU offered to settle EPA's claim against it for a higher amount than the payment specified in EPA's proposed Consent Decree with MBTA. EPA rejected APU's offer, made no counter offer and has not offered any proof to support its claim that the contamination was placed at the Site when the additional tracks were installed in or about 1893. To the contrary, the information currently available is inconsistent and incomplete. It indicates that several PRPs may have caused or contributed to the contamination. Despite this lack of evidence, the inconsistency of the currently available information, and the incomplete investigation, EPA continues to demand that APU reimburse EPA for its past response costs.

## II.    <u>Background</u>

This matter involves disputed claims arising out of soils and/or fill material contaminated



BLANK ROME LLP
COUNSELORS AT LAW

Asistant Attorney General
October 24, 2005
Page 3

with paint chips that contain lead and chromium near a culvert that drains water from Morse's Pond under a large berm that supports a railroad right of way ("RR ROW") and a state highway. The Site is located in the Town of Wellesley, Norfolk County, Massachusetts adjacent to the north side of a RR ROW that runs east and west from Boston, Massachusetts to Albany, New York. The culvert is located a short distance west of mile post (MP) 16 on that RR ROW, between MP16 and MP17.

This matter is limited to claims by EPA to recover past response costs, which were incurred more than three years ago. It does not include any claims for future response actions. EPA has alleged that the Massachusetts Department of Environmental Protection ("MDEP" or "DEP") discovered the contamination in Morse's Pond in 1994 and that EPA incurred more than $4 million in response costs and prejudgment interest ("PJI") for investigation and remediation of that contamination. In a press release, dated June 14, 2002, EPA stated that it completed its removal action, but to the best of APU's knowledge, EPA did not commence any action within three (3) years of that date on June 14, 2005. However, in a good faith effort to settle disputed claims with EPA, APU agreed to enter into two agreements that tolled the running of applicable statutes of limitations between July 20, 2005 and October 20, 2005. EPA has not offered or requested to extend the tolling agreement beyond that date.

EPA's past response costs involve investigation and removal of contaminated sediments in Morse's Pond and investigation, removal and capping of contamination in a small sliver of soils and fill material adjacent to the north side of the RR ROW on the east and west sides of the culvert. EPA alleges that the contamination was placed there by the Boston and Albany Railroad ("B&A") in or about 1893 when a third track and a fourth track were installed along the north side of two existing tracks in the RR ROW. EPA alleges that the culvert was extended 27 feet to the north at that time, that B&A constructed the extension and that the contamination was present in fill that was placed at the Site during extension of the culvert and installation of the two additional tracks.

EPA has also alleged that APU is the successor to B&A. APU does not admit that it is the successor to B&A but, for purposes of this comment, APU does acknowledge that it is the company that evolved from the bankruptcy of Penn Central Transportation Company and its predecessors (collectively "PCTC") and that PCTC operated this RR ROW before 1973 when it sold its interests to MBTA.

Other PRPs have a nexus to this Site, including the Town of Wellesley, Norfolk County, the Massachusetts Highway Department ("MHD"), Amtrak and CSX.

EPA alleges that B&A placed the contamination at the Site in or about 1893 when the



Asistant Attorney General
October 24, 2005
Page 4

additional tracks were installed but EPA can not prove who built the culvert, who placed the
contamination near the culvert or when it was actually placed there. If, however, the
contamination was placed there before PCTC sold its rights to MBTA in 1973, EPA could have
asserted claims against PCTC in its bankruptcy proceeding under various statutes, including the
Refuse Act of 1899, the Rivers and Harbors Appropriation Acts, 33 U.S.C. § 401 et seq., the
Resource Conservation and Recovery Act, 44 U.S.C. § 6901 et seq., and the Clean Water Act, 33
U.S.C. § 1251 et seq. Among other things, if the contamination actually predated PCTC's sale to
MBTA in 1973, EPA could have asserted a claim under Section 311 of the Clean Water Act to
clean up the contamination or to reimburse EPA for any response costs it might incur in
responding to that contamination. These claims were discharged. Likewise, any similar claims
now by EPA under CERCLA should be barred.

### III.   EPA's case against all the PRPs is similarly weak due to a lack of evidence of when the contamination actually occurred and, therefore, which parties are liable under CERCLA.

EPA has asserted in the Complaint that MBTA is a PRP pursuant to CERCLA § 107(a),
42 U.S.C. § 9607(a), because MBTA allegedly owns a portion of the Site, which was allegedly
owned or operated PCTC in 1973. The Complaint does not assert liability on behalf of MBTA
due to anything other than its alleged ownership of a portion of the Site.

EPA's claim against APU is based on many assumptions it can not prove, including: (1)
B&A allegedly placed the contamination at the Site when the third and fourth railroad tracks
were installed in or about 1893; (2) the original 117 foot brick arch culvert that supported the
state road and the first two tracks was not sufficient to support the new tracks even though they
are located on top of the original 117 foot brick arch culvert; (3) it was necessary to build an
extension to the northern end of the culvert approximately 27 feet long to support the new
tracks[1]; (4) B&A built the northern extension of the culvert even though the culvert was also
extended to the south approximately 48 feet with a similar design and similar construction
materials and B&A had no apparent motive to build that extension; and (5) B&A placed the fill
along the northern extension to the culvert and also placed the contamination there at that time.
EPA's burden of proof is compounded by several curious coincidences, including: (a) although
the northern and southern extensions to the culvert are very similar and were apparently built at
or about the same time, the fill in the southern extension was not contaminated and the fill along
the rest of the RR ROW that presumably would have been added to support the new tracks is
also not contaminated; (b) the top of the berm above the northern culvert is not contaminated;
and (c) the highest concentrations of contamination are present in a sliver of fill near the toe of

---

[1] See Complaint ¶ 6.



Asistant Attorney General
October 24, 2005
Page 5

the slope and the wing walls of the culvert that was not present in a photograph taken after the extension was built.

In contrast to EPA's improbable allegations, there is considerable information to support a contrary conclusion that each of EPA's assumptions is erroneous and/or uncertain, including: (1) the 2 additional tracks were located on top of the original brick arch culvert, so that the culvert extension may not have been necessary to install these tracks; (2) even if the culvert extension was necessary, it was not necessarily built by B&A; (3) the construction materials used in the northern and southern extensions are similar, which suggests they were designed by the same party; (4) B&A had no reason to construct the southern extension, which underlies MA Route 135; (5) historic documents indicate the extensions may have been built by the County or a predecessor of the Massachusetts Highway Department ("MHD"); (6) ownership and/or control of the culvert is uncertain—for example, MHD has admitted that it owns the culvert,[2] while documents also indicate that the B&A may have owned at least the wing walls and head wall of the northern end of the culvert;[3] (8) the Morses Pond Dam was built in or about 1888 to regulate the flow of water from the Pond and to adjust the level of the Pond in winter and summer; (9) the Town currently operates the Dam; (10) the paint waste appears to be limited to a small sliver of the berm that is both near the berm's surface and near the toe of the slope, the surface of the slope and the south shore of Morse's Pond, which is owned and operated by the Town;[4] (11) this paint waste may have been placed on the berm with sediments from the pond when it was dredged in prior years;[5] (12) if paint waste was commingled with other fill used in the railroad portion of the berm, you would expect elevated chromium levels to be present in other portions of the berm and not just in the immediate vicinity of the Pond; and (13) an earlier photograph of the headwall and wing walls of the culvert extension indicates that the toe of the berm did not extend to the wing walls when the culvert was extended.[6] In fact, the small sliver

---

[2] *See*, e.g., Letter from MHD to the Town of Wellesley's Police Department, dated April 1993, a true and correct copy which is attached hereto as Exhibit A.

[3] *See* Interstate Commerce Commission ("ICC") Records of B&A that value the headwall and wing walls of the culvert's northern end. Markedly absent from this valuation are the valuation of the culvert itself or of the appurtenances of the southern end of the culvert. A true and correct copy of this valuation is attached hereto as Exhibit B.

[4] *See* Affidavit of Kerry M. Hanlon, the original which is attached hereto as Exhibit C, Exhibit 2 (Color-coded drawing prepared by Roux Associates, Inc. dated Jan. 10, 2001) & Exhibit 4 (Cross Section of Berm).

[5] As described in a 1993 article by the Town of Wellesley Natural Resources Commission, a true and correct copy which is attached hereto as Exhibit D, between 1976-1979, pursuant to EPA funding, the Commonwealth undertook a $700,000 dredging project to remove accumulated sediments and organic nutrients from the bottom of Morses Pond, in order to deepen the pond. The chromium concentrations in samples from the 1976-1979 dredging project were lower than the concentrations in the paint waste on the berm, but that waste may have been placed on the berm in connection with prior dredging.

[6] This photograph, a true and correct copy of which is attached hereto as part of Exhibit 1 to Exhibit A, was obtained



**BLANK ROME** LLP
COUNSELORS AT LAW

Asistant Attorney General
October 24, 2005
Page 6

of the berm containing contaminated materials could have been added at almost anytime during the 100+ years between 1893, when EPA alleges the culvert was extended, and when DEP claims the contamination was discovered in 1994, including at a time when an access road for an ice house was built sometime after the tracks were installed and prior to 1916.[7]

### IV.    APU's liability to EPA is even more tenuous than that of MBTA.

In order for a former owner, as opposed to a current owner, to be liable for response costs pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), EPA would have to prove APU owned the Site when the release or threat of release of chromium or lead occurred. EPA's evidence in this regard is lacking and inconsistent. In addition, APU, unlike MBTA, has the benefit of federal bankruptcy protection which discharges any and all claims accruing prior to the approval of the Penn Central Reorganization Plan, approved in 1978. Thus, APU's liability to EPA is even more tenuous than that of MBTA.

### V.    The Consent Decree is arbitrary and capricious and should not be approved.

In order for a consent order to be upheld, it must be fair, reasonable, in the public interest and further statutory goals.[8] It is clear, that the fairness inquiry "introduces into the equation, concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible."[9] While a settlement may be approved despite not being the "best possible" settlement because consistency with CERCLA favors settlement over litigation,[10] and the joint and several liability prescribed by CERCLA inherently assumes disproportionate liability,[11] it is blatantly unfair to arbitrarily assign a percentage of fault to one PRP, while allowing another potentially liable party to absorb the difference with no pointed reason. The effect on nonsettlors should still be examined.[12]

If the subject Consent Decree is approved, APU's potential exposure to the liability for

---

from the Society for the Preservation of New England Antiquities, and is estimated to be dated sometime between 1900 and 1915 (notably after the time EPA assumes the culvert was extended and the additional tracks were added).
[7] *See Exhibit C, Exhibit 3.*
[8] *See U.S. v. Charter Intern. Oil Co.*, 83 F.3d 510 (1st Cir. 1996); *U.S. Cannons Eng'g Corp.*, 899 F.2d 79 (1st Cir. 1990)
[9] *U.S.v. Pesses*, 1994 WL 741277, at *6 (W.D. Pa. 1994) (quoting *Cannons Eng'g*, 899 F.2d at 85.
[10] *U.S. v. Union Elec. Co.*, 934 F. Supp. 324 (E.D. Mo. 1996), *aff'd*, 132 F.3d 422 (8th Cir. 1997).
[11] *See Cannons Eng'g Corp.*, 899 F.2d at 91-92.
[12] *See* H.R. Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 USCCAN 3038, 3042 (discussing that Congress anticipated that the federal courts would apply standards [of review] with broad generality to determine whether the proposed decrees are both fair and faithful to the statute, taking into account the interests of the public at large, the settling parties and the non-settlers alike).



**BLANK    ROME** LLP
COUNSELORS AT LAW

Asistant Attorney General
October 24, 2005
Page 7

EPA's response costs will increase tremendously, because APU will not be able to seek contribution from MBTA. APU notes that due to the lack of evidence against MBTA, EPA might not be able to recover a substantial portion of its past response costs from MBTA if the Consent Decree is not approved. Nonetheless, because EPA has a similar lack of evidence against APU as well as inconsistent evidence, and, indeed, APU has additional defenses not available to MBTA, it would be substantively unfair to allow MBTA this settlement without a similar settlement offer to APU. Likewise, it is patently unfair to arbitrarily assign a percentage of fault to only one of several PRPs without conducting adequate due diligence, and here, due diligence has not been completed. Thus, the Consent Decree is unfair. Moreover, while settlements might be approved despite apparent unfairness or unreasonableness in circumstances that further the objectives of CERCLA by fostering a more complete or speedier cleanup of hazardous substances, this particular Consent Decree does not further this objective because EPA only seeks through this settlement the recovery of *past* response costs. EPA has considered the removal action completed since 2002.[13]

If EPA wants to settle with MBTA for $150,000, it should likewise agree to settle with APU for a similar amount because the quality of EPA's claim against APU is, at best, comparable to, or weaker than, its claim against MBTA. Among other things, MBTA was operating the RR ROW when MDEP allegedly discovered the contamination in 1994. To qualify for a third party defense or an "innocent purchaser" defense, MBTA would have to prove by a preponderance of the evidence that the contamination occurred before 1973 and that MBTA satisfied all of the conditions set forth in CERCLA Section 107(b)(3). There has been no offer of proof to sustain these burdens. And, even if MBTA could meet these evidentiary burdens, EPA would have to contend with APU's bankruptcy discharge arguments.

Under these circumstances, EPA should not be permitted to settle with MBTA and seek a joint and several judgment against APU for the balance of its claim.

In addition, the Consent Decree is also arbitrary and capricious because it does not give the interested public enough information to comment. Accordingly, the Consent Decree offers no reasons for arriving at the settlement amount of $150,000. This absence of supporting facts is inescapable given the state of the due diligence in the investigation of the PRPs' liabilities. Furthermore, this clearly violates Section 122(i) of CERCLA, 42 U.S.C. § 9622 (i), because to meet the public comment requirements of CERCLA, while there need not be "an exhaustive and detailed recitation of every fact," there must be sufficient facts presented to determine whether the proposed settlement is "reasonable, fair, and consistent with the purposes [of] CERCLA."[14]

---

[13] Complaint ¶ 17.
[14] *U.S. v. Davis*, 11 F. Supp. 2d 183 (D.R.I. 1998), *aff'd*, 261 F.3d 1 (1st Cir. 2001).



Asistant Attorney General
October 24, 2005
Page 8


Here, the Consent Decree presents *no* facts.

        In essence, the Consent Decree does nothing to further the objectives of CERCLA, is
unfair to APU and gives no reasons for its settlement terms.  As such, the Consent Decree is
arbitrary and capricious and should not be approved.



Dated: October 24, 2005                    Respectfully submitted,

                                           BY:

                                                Benjamin G. Stonelake, Jr.
                                                Jennifer L. Cohen
                                                BLANK ROME LLP
                                                One Logan Square
                                                Philadelphia, PA  19103-6998

                                                *Attorneys for APU*




BGS:emi
Enclosures

# Exhibit A

# MASS HIGHWAY

| William F. Weld | Argeo Paul Cellucci | James J. Kerasiotes | Laurinda T. Bedingfield |
|---|---|---|---|
| Governor | Lieutenant Governor | Secretary | Commissioner |

056

April 23, 1993

Mr. Thomas J. O'Loughlin
Chief of Police
Wellesley Police Department
Wellesley, MA 02181.

Subject : Granite Arch Culvert
          Wellesley — Rte. 135 over Lake Waban
          Bridge No.  W-13-22

Dear Mr. O'Loughlin

    This is in response to your letter regarding a citizen's
concern over the unsafe condition of the subject Granite Arch
Culvert. The District 4 Structures Maintenance Section has
inspected this structure on the basis of the informations and
photographs received from your Department.  The structure was
also inspected by our Underwater Bridge Inspection Team. On the
basis of our inspections the structure was found to be in  safe
condition and there is no major deficiency in the structure which
may cause unsafe driving condition on Route 135.

    This is the only structure on Route 135 which is owned
by the state. The District 4 Structures Maintenance Section has
already informed Lieutenant Jack Broyles that the structure is
safe. However the Department appreciates the concern of Mr. Howard
Bolles regarding the safety of this structure.

Sincerely  yours,

Laurinda T. Bedingfield
Commissioner Mass. Highway Dept.

*Massachusetts Highway Department • District 4 • 519 Appleton St., Arlington, MA 02174 • (617) 648-6100*

MAR 1 0 1995

Exhibit B

D. V. FORM NO. 67
**INTERSTATE COMMERCE COMMISSION**
DIVISION OF VALUATION
PAGE 99

DATE 1/19/16

CARRIER B+A RR

A H Fairfield B+A RR    H. A. Farnham, FOR CARRIER
H. L. English K.C. R.
VALUATION SECTION 1    13—715    H. English FOR I.C.C.

ACCOUNT 6

Bridge 34 - Morse's Pond
Sta.
13 p. 4 Tr. Stone Arch 10'-6" Span

Structure agrees with Carrier's Plan —

Masonry Large Rubble Granite in Mortar #2121 May 1893
Ring Stone Dressed Joints

Excav. with Cofferdams necessary

Sewts New Concrete H. Wall No. Side 52"-lg.
On top of old Masonry.

Wooden Bridge on N. walls at No End of Arch
Timber Y.P.
3" Plank
4 Posts 4"x6" x 4'-6"
1 Rail 4"x6"
16 R. 6"x8"
4 Stringers 3"x12"
Original Bridge
Squared up
to take Wooden
Bridge    Top of Pier + Built up Masy
1'-5 below Underpinning (Original)

Ring Rubble walls at Ends of each masy
ea. 40"x6"x3

2 Box Signs 2'x2x7/8    1 on 4½" Round Post
4½



# COMPUTATIONS

D. V. FORM NO. 69

**INTERSTATE COMMERCE COMMISSION**
DIVISION OF VALUATION

PAGE 1 of 3

DATE May 11, 1916.

CARRIER B.+A. R.R.

LOCATION Val. Sec. 1. Br. #34    ACCOUNT NO. 6

FIELD SHEET NO. 94

W.H. Fairbanks FOR CARRIER
L.M. McDonald FOR I.C.C.

## DESCRIPTION

Masonry — Large Rubble Granite in Mortar

**Arch**
$20'-9'' + 19'-2'' \times 10'-3'' + \dfrac{4'-4'' \times 19'-2''}{2} = 244$ sq ft.

$\dfrac{5'-3\frac{1}{2}'' \times 5'-3\frac{1}{2}''}{2} \times 3.1416 + 6'-4\frac{11}{16}'' \times 10'-5'' = 110.7.$

**Ring Stone** $16'6 \times 1'-4'' + 2(2 \times 1.67) = 28.7$
Deduct → 139.4 }

$(244 - 139) \times 140 = 14700$ cu ft.
$544$ cu. Yds

**Wings**
$\dfrac{(3 + 8'-6'')}{2} \times 15'-1\frac{1}{4}'' + (8'-6'' \times 1'-6'') = 99.57$

$\dfrac{2'-6'' + 3'-6''}{2} \times 2'-6 = \dfrac{7.5}{2\overline{|107.07}}$
$53.53$ sq ft

$53.53 \times 2.6 \times 2 = 27.84$ cu ft = 10.3 cu Yds

**Head Wall**
$\left[\dfrac{4'-6'' + 3'-0}{2} \times 3'-5'' + \left(\dfrac{6' \times 2}{2}\right)^{av.}\right] \times 20'-9 = 390$

$\left(\dfrac{3'-6'' + 2'-6''}{2} \times 1'-6''\right) \times 19' = 86$
$476 = 18$ c.Y.

| | | | |
|---|---|---|---|
| $544 + 103 + 18 = 665$ Cu Yds | Large Rubble Granite in Mortar | Cu. Yds. | 665 ✓ |
| **Ring Stones** See above  $28.7 \times 140 = 4018$ cu ft = 14.8 Cu Yd. | Glass "A" Dressed stone | Cu. Yds | 148 ✓ |
| **H. Wall** $\left(\dfrac{2+3}{2} \times 5 + 1.5 \times 5\right) 52 = 689$ cu ft = 26 Cu Yds | Concrete | Cu. Yds | 26 ✓ |
| **Dry Rubble Walls** $40 \times 6 \times 3 \times 2 = 1440$ Cu ft = 53 Cu Yds | Dry Rubble | Cu. Yd | 53 ✓ |

COMPUTED BY B.F. Williams

CHECKED BY L.M. McDonald

# COMPUTATIONS

D. V. FORM NO. 69

**INTERSTATE COMMERCE COMMISSION**
DIVISION OF VALUATION

PAGE 2 of 3

DATE May 11, 1916.

CARRIER B & A. R.R.     ACCOUNT NO. 6

FIELD SHEET NO. 34

H.H. Farnham ___ FOR CARRIER

LOCATION Val. Sec. #1 Br. #34     L. McDonald FOR I. C. C.

| DESCRIPTION | | | |
|---|---|---|---|
| Masonry Extension on Wings To carry | | | |
| Wooden Bridge    (see plan) | | | |
| $\frac{5+25}{2} \times 15.6 - \frac{5+25}{2} \times 5.6 = 27.5$ | | | |
| $\frac{37.5 + 0}{2} \times 1.5 = 281$ cu. ft. $= 10$ Cu. Yds. | | | |
| $2' \times 10 = 20$ " | | | |
| | | | |
| Pier | | | |
| $12'-7\frac{1}{2}' \times 3' \times 12 = 454°$ | | | |
| Found. | | | |
| $4 \times 4 \times 13 = 208°$ | | | |
| $662° = \frac{25 \text{ Cu. Yds.}}{45°}$ Granite Rubble in Mortar | Cu. Yds. | ✓ | 45 |
| | | | |
| **Excavation** | | | |
| | Wet | | |
| Arch $22 \times 15 \times 14.5 = 4785°$ | | | |
| Wings $\frac{10'-6'' + 5'-6''}{2} \times 15 \times 5.2 = 624°$ | | | |
| Pier $6 \times 15 \times 15 = 135°$ | | | |
| $205$ Cu. Yds. $= 5544°$ | | Cu. Yds | 205 |
| | | | ✓ |
| | | | |
| | | | |
| **Cofferdams** | | | |
| Timber | | | |
| $438 \times 12 \times 4.5 = 23650$ F.B.M. | | | |
| Pier $45 \times 12 \times 4.5 = 2430$ | | ✓ | |
| Hardware | $26080°$ " | | |
| $438 \times 12 \times \frac{1}{4} = 1314°$ | | | |
| Pier $45 \times 12 \times \frac{1}{4} = 135°$ | | | |
| $1449°$ # | | ✓ | |

COMPUTED BY B.F. Williams

CHECKED BY L. McDonald

12—718

## COMPUTATIONS

D. V. FORM NO. 69

DATE May 11, 1916

CARRIER B. & A. R.R.

LOCATION Val. Sec. #1 Br. #34

**INTERSTATE COMMERCE COMMISSION**
DIVISION OF VALUATION

ACCOUNT NO. 6

PAGE 3 of 3

FIELD SHEET NO. 34

H.H. Farnham FOR CARRIER

L. McDonald FOR I. C. C.

### DESCRIPTION

*Timber*    Y. P.

| | | | | | |
|---|---|---|---|---|---|
| Floor | $\frac{195+345}{2} \times 15 \times 3''$ = | 1215 | | | |
| G.R. | $6'' \times 8'' \times 36$ = | 144 | | | |
| Stringers | $3'' \times 12'' \times 27' \times 4$ = | 324 | | | |
| Sills | $12'' \times 16'' \times 2'-6'' \times 6$ = | 240 | | | |
| | $2'' \times 10'' \times 16' \times 2$ = | 53 | | | |
| | | 1976 | Y. P. | FBM | 1976 |

*Fence*

| | | | | |
|---|---|---|---|---|
| 35 Lin ft. { 9 Post $4'' \times 6'' \times 4'-6''$ / 1. Rail $2'' \times 6''$ | | | Lin. Ft. | 35 |

*Hardware*

| | | | | | |
|---|---|---|---|---|---|
| Nails | $\frac{195+345}{2} \times 15 \times .15$ = | 60 # | | | |
| G.R.s | Bolts + Washers - est. | 40 # | | | |
| | Stringer Bolts '' | 20 | | | |
| | | 120 | Hardware | Lbs | 120 |

| | | | | |
|---|---|---|---|---|
| 2 B.R. Signs $2 \times 2 \times \frac{3}{16}$ { 1 on 4'' Rail Post / 1 on 4½'' '' | | | No | 2 |

Old $10'' \times 10''$ Br. Ties used in Foundation

| | | | |
|---|---|---|---|
| $[134 \times 20.75 + (35 \times \frac{22 + 2766}{2}) + (575 \times \frac{2766 + 32}{2}) +$ $(20 \times \frac{10 + \frac{1}{4}}{2} \times 2)] \times 10''$ = 33390 | Old Ties | FBM | 33390 |

COMPUTED BY R. H. Williams

CHECKED BY L. McDonald

Exhibit C

## AFFADAVIT OF KERRY M. HANLON

Re:    United States v. Massachusetts Bay Transportation Authority (DOJ Ref. 90-11-3-
       07035/2)

I, Kerry M. Hanlon being duly sworn according to law, do affirm and state as follows:

1.   I am employed by Unicorn Management Consultants, LLC and currently hold the
title of Director of Geotechnical Services.

2.   I hold Bachelors and Masters degrees in Geology from S.U.N.Y. Brockport and
Miami University, respectively.  I am a duly registered Professional Geologist in
Pennsylvania and Delaware, a Certified Professional Geologist with the American
Institute of Professional Geologists, and a Licensed Environmental Professional in
Connecticut.  I have been actively practicing in the field of environmental consulting
since 1989.

3.   Unicorn Management Consultants, LLC has been retained by Blank Rome LLP to
provide environmental consulting services on behalf of American Premier Underwriters,
Inc. with regard to certain environmental issues associated with the project commonly
known as the Morse's Pond Culvert Site.

4.   I have primary responsibility within Unicorn Management Consultants, LLC for
the Morse's Pond Culvert Site.

5.   I have reviewed and am familiar with certain project documents provided by the
EPA to American Premier Underwriters, Inc. and other documents obtained
independently by American Premier Underwriters, Inc.

6. These documents include:

    a.    an archival photograph from the Society for the Preservation of New England Antiquities ("SPNEA") that depicts the head wall and wing walls at the north end of the Morse's Pond Culvert in the early 1900s, which is included herewith as Exhibit 1;

    b.    a color-coded drawing prepared by Roux Associates, Inc. (Roux), dated January 10, 2001, that depicts chromium concentrations reported to be present in samples collected by contractors of the Massachusetts Department of Environmental Protection (DEP), which is included herewith as Exhibit 2; and

    c.    a photocopy of records of the Interstate Commerce Commission, Division of Valuation (ICC), dated 6/4/15 and 1/19/16, that depict the cross section of the right of way slightly east of the culvert at station 845+15, between mile post (MP) 16 and the culvert, which is included herewith as Exhibit 3.

7. In connection with prior communications between Blank Rome and EPA, I prepared a cross section of the Morse's Pond Culvert based on information obtained from EPA files and from Exhibits 1 and 2. This cross section is attached hereto as Exhibit 4.

8. I have been advised that a representative of the SPNEA stated that the photograph in Exhibit 1 was probably taken between 1900 and 1915.

9. Exhibit 2 is a color coded drawing that graphically depicts an aerial view of the relationship between Morse's Pond, the Morse's Pond Culvert, appurtenances, and embankments, and chromium concentrations in soils and fill material near the culvert.

10. The color coded map in Exhibit 2 clearly shows that the higher concentrations of chromium at the Morse's Pond Culvert Site are located behind the wing walls in areas that were not filled when the photo in Exhibit 1 was taken.

11. Exhibit 4 graphically depicts a cross section view of the relationship between Morse's Pond, the Morse's Pond Culvert and appurtenances, overlying railroad tracks and embankments, and soils exceeding the removal criteria as determined by USEPA. This Exhibit also contains my estimated location of the slope of the embankment when the photograph in Exhibit 1 was taken.

12. Based on Exhibits 1, 2 and 4 and the other materials I have reviewed, it is my opinion that, within a reasonable degree of scientific certainty, the original embankment slope identified in Exhibit 4 as "Estimated Position of Slope From Photograph (Exhibit 1)" did not include the soils and fill material that were the subject of EPA's removal action at this Site.

13. As such, it is my opinion that the additional material added to the embankment over and beyond this slope, including all embankment soils depicted as containing contaminants above removal action concentrations, were not placed on the embankment when EPA claims that the additional tracks were installed in about 1893.

14. The contaminated soils and fill may have been placed on the embankment when the access road for an ice house was installed at a later date before 1916, as depicted in Exhibit 3, but the contamination also could have been placed on the embankment at any other time after the photograph in Exhibit 1 was taken and before DEP claims it discovered the contamination in 1994.

Kerry M. Hanlon
Director of Geotechnical Services
Unicorn Management Consultants, LLC

Sworn to and subscribed before me
this 21st day of October, 2005.

Notary Public

NOTARIAL SEAL
Deborah L. Rizzo, Notary Public
Philadelphia, Philadelphia County
My commission expires November 20, 2007

Exhibit C
Attachment 1



Exhibit C
Attachment 2



Exhibit C
Attachment 3

Reproduced at the National Archives





264

PAGE

FOR CARRIER
FOR I.C.C.

INTERSTATE COMMERCE COMMISSION
DIVISION OF VALUATION

B. Miller,
B. M. Harding
E. O. Olsen

ER Boston-Albany
on section 1

4/3/15

FM NO 84





Reproduced at the National Archives



Reproduced at the National Archives



Reproduced at the National Archives



Reproduced at the National Archives



Exhibit C
Attachment 4



Exhibit D



# Morses Pond

In 1738, when Wellesley was part of Dedham, Edward Ward dammed his brook, creating a millpond where Morses Pond is today. The pond couldn't have been very large or permanent since an Ancient Plan of the Commonwealth dated 1771-75 shows no pond there.

By the turn of the century, however, a Broad Pond existed close to the Natick Road, now known as Central Street or Route 135. Miller Thomas Broad or an unknown predecessor may have built the historic cobbled stone structure we now call Paintshop Dam. An 1831 survey map of Needham shows a small pond and milldam in the ownership of Daniel Morse. From this date onwards the pond is known as "Morses Pond."

In the year 1834 the Boston & Worcester Railroad extended its tracks and constructed a 117-foot-long, stone-walled, brick-arched culvert on a log foundation to carry Waban Brook under the railroad line. That old brick culvert forms the central section of Morses Pond's sole outlet today.

By 1848 the Henry Wood & Sons Paint Company had bought the dam and water rights and created Paintshop Pond. According to a study done in 1978 by hydrologist Elliot F. Childs, the changes backed water in the railroad culvert up to five feet deep and raised the level of Morses Pond by 3–4 feet. Both Morses Pond and Paintshop Pond are shown on the 1856 and 1876 Maps of Needham.

By 1888 ice-making had become big business. The Russell Ice Company built an icehouse on the cove called Ice House Pond and, to increase the size of the pond for ice harvesting, started work on the

*By custom, Morses Pond is spelled with or without an apostrophe.*

present Morses Pond Dam. This required changes at the brick outlet culvert. In 1893 the culvert was extended 27 feet to the north, and later it was extended 48 feet south.

The Boston Ice Company bought the ice business in 1902. By 1909 Boston Ice had acquired more land from the Waban Rose Conservatories together with the right to raise Morses Pond's water level as high as "two feet above the copper bolt" in the dam. When the dam was raised, low-lying land was flooded nearly to Worcester Street (Route 9).

For 25 years the ice business flourished. Ice was grooved with horse-drawn plows into four foot blocks, then floated onto an endless belt which lifted the blocks into the icehouse to be packed in sawdust. With the paint factory railroad spur nearby, ice from Morses Pond froze ice cream in Boston and cooled rum punches in the Caribbean. But after the boom came the bust: In the 1920's electric refrigerators were invented and the ice business collapsed. The Metropolitan Ice Company bought Boston Ice's brand-new equipment and moved it to Longfellow Pond.

Then the Great Depression arrived. In 1931 the Town was able to buy 84 park acres for just $3000. Wellesley's first bathing beach was developed with labor provided by federal relief programs.

Preparing for future needs, the town's Water Department bought an additional 16 acres of land at Morses Pond to augment the town's water supply from wells near Rosemary Brook. Test wells were driven and abundant good water was found. Morses Pond Well #1 and the present pump station were completed in June of 1938. The Great Hurricane struck in September. For three days the new pump station supplied *all* of Wellesley's water—its modern wiring was safely underground.

In 1942 the Water Department bought another 22 acres from the Boston & Albany Railroad. A second well was installed in 1953 and the pond level was raised for the last time. A third well was constructed in 1981, and Well #2 was rebuilt. The original Morses Pond well served until November 1990. It was replaced in 1991.

## GREAT POND OR NOT?

Lake Waban is a great pond but Morses Pond is not. The reason lies in the quirks of Massachusetts law and the depths of historical research.

The Colony Ordinances of 1641–1647 established the right of Massachusetts citizens to cross unimproved land on foot to fish, fowl or boat on natural great ponds of the Commonwealth. Today, Chapter 91 Section 35 of the Massachusetts General Laws controls public rights in great ponds containing more than 10 acres *in their natural state*. Since Morses Pond was created by damming over three centuries, it is not a great pond and is under town control.

In 1968 the Public Access Board of the Massachusetts Department of Fisheries, Wildlife and Environmental Law Enforcement claimed rights in Morses Pond under MGL Ch.91 §35 in order to build a motorboat access from the Natick gravel pit. Town Counsel Harry Warren drew up a legal brief outlining the history of the Pond. This was sent by the Board of Selectmen to the State Attorney General and state claims were dropped. Town Meeting then adopted the present bylaw which prohibits internal combustion engines on Morses Pond.

## ACCESS

Access to Morses Pond for automobiles is *via* Weston and Turner Roads (see map on back cover). An unpaved parking area is provided.

For bikers, a bicycle path runs along the south side of Turner Road to the beach area. For pedestrians, an unpaved trail along the Cochituate Aqueduct provides access to the pond at various points, including access to town-owned Pine Point and Bird Point (Fisher's Island) and the Wellesley Conservation Council's Pickle Point Sanctuary.

## THE MODERN POND

Today, Morses Pond is a man-made pond of about 102 acres lying between Routes 9 and 135 just north of the railroad tracks at Bacon Street. About 4.2 acres lie in Natick. The Pond drains a watershed of 8.8 square miles, only 21% of which is in Wellesley. Its average depth is 7 feet; the maximum depth is 23 feet. Due to the water elevations provided by the Paintshop and Central Street dams, the Pond actively recharges the aquifer which feeds Wellesley and Natick municipal wells.

Three brooks enter the north end of Morses Pond— *Bogle Brook, Boulder Brook* and *Jennings Brook.*

Bogle Brook has a drainage basin of about 4.5 square miles. It originates in Nonesuch Pond in Weston and drains about 53% of the Morses Pond watershed. Jennings Brook has a drainage basin of 2 square miles. It flows from Jennings Pond in Natick and drains about 24% of the Morses Pond watershed. Boulder Brook's drainage basin of 1.1 square miles includes much of Wellesley's northwest corner, the Fells, and a portion of Weston. It accounts for 13% of the drainage to Morses Pond.

Water from these brooks carries nutrients from lawn fertilizer and upstream septic systems and run-off from Route 9. Since the brooks flow through humus

Case 1:05-cv-11748-RWZ    Document 3-4    Filed 03/03/2006    Page 6 of 15

and peat deposits, the natural color of the pond water is tea-brown. This color reduces the transparency desirable for safe swimming.

Other sources of inflow to Morses Pond include the following: 1) ground and surface water from a 24" drain near Russell Road; 2) surface water from at least eight storm drains; 3) flood flows from upstream communities via the Dadmun waste weir on the Cochituate Aqueduct; and 4) surface water runoff from adjacent properties.

Wellesley's municipal wells #1, #2 and #3 are located on the southeast corner of the pond at the end of Turner Road where water-bearing sand and gravel deposits are thickest. The combined capacity of the three wells is 2.1 million gallons per day or 40% of the Town's peak capacity. The well water is chlorinated for disinfection. Sodium fluoride is added for dental health. Sodium hexametaphosphate is used to sequester iron and manganese to control staining of bathroom fixtures.

Near the pumphouse a great chunk appears to have been bitten out of the glacial ridge where the esker was once mined for sand and gravel. Today the old gravel pit is recognized as a critical part of the wells' Zone II recharge area, which provides about one-third of the water in the wells. Morses Pond provides the other two-thirds through infiltration induced by pumping.



ater levels in Morses Pond are managed by the Town Department of Public Works Water & Sewer Division by removing or replacing stoplogs in the Central Street dam. After spring rains are over, the pond level is raised for recreation to 121.5 feet above mean sea level. It is lowered to about 120 ft. MSL in the fall.

## ≈ REGULATIONS ≈

Use of the Morses Pond area is governed by three sets of rules:

1. *Police Regulations.* Town Bylaw Article 49 includes a ban on nude swimming and internal combustion engines;

2. *Park Regulations.* The Natural Resources Commission's *General Regulations for Park and Conservation Lands* include the following:
   · No firearms, hunting or trapping
   · No drugs or alcoholic beverages
   · No dumping or littering
   · No cutting or removal of trees or plants
   · No conduct, including excessive noise, which interferes with the enjoyment of others.

3. *Beach Regulations.* Rules for the use of the town beach are set by the Recreation Commission. Beach regulations include:
   · Beach hours are 10:00 AM to 7:00 PM during the beach season
   · No beach umbrellas, inflatable toys, scuba gear, tubes or rafts
   · No gasoline motors
   · No pets
   · No fishing from the dock or beach
   · Sailboats may be moored for the season at the tagholder's risk
   · Children under 11 years must be accompanied by an adult.

## THE PUBLIC BEACH

In the mid-sixties the Massachusetts Department of Public Health issued rules governing the operation of public beaches. Since the original town beach was within 400 feet of the town wells, it had to be moved. Today's beach was started in 1968 and opened for swimming in 1972. It is licensed annually by the Wellesley Health Department under state regulations for bathing beaches (105 CMR 445).

3

The water is tested twice weekly for coliform bacteria during the swimming season. The beach is managed by the Wellesley Recreation Department.

The beach is open to Wellesley residents and their guests from early June to mid-August. It is a very popular place to go—attendance in 1992 was 42,996 visitors. Seasonal beach tags may be purchased at the beach office. Facilities include a bathhouse with restrooms and changing areas, shelters, picnic tables and grills, and public parking. The main dock includes a teaching area, a competitive swimming area, and three diving boards. There is an area for lap swimming, two deep water rafts, a sailing dock and two sailboats used for lessons and rentals. A paved path and water railing have been provided for beachgoers with special needs. Handicapped toilet facilities are not yet available.

Each year the Recreation Department offers swimming lessons for children and adults as well as lifeguard training. Courses in kayaking, canoeing and sailing are also available. The Morses Pond Swim Team always welcomes new members.



## SAILING AND FISHING

Recreational sailing is possible on Morses Pond but competitive sailing has been thwarted in recent years by the growth of weeds. The Sailing Club still meets socially but no longer sponsors races for lack of a weed-free course.

Sizable bass and even pickerel were once caught in Morses Pond. Today the fishery is largely yellow perch, bluegill and pumpkinseed sunfish, together with very small bass, carp, white suckers, and the occasional eel.

## EUTROPHICATION

Since two-thirds of Morses Pond overlies flooded swamps and meadows, much of the bottom is organic muck. Silt and nutrients from upstream septic systems wash into the pond from the three inlet brooks and settle out in the north end of the pond. The Pond, being shallow, warms up quickly in the spring. These conditions support rapid weed and algal growth. Weeds trap sediments and each year add another layer of organic material to the bottom of the pond. Floating weeds and algae reduce visibility and add more organic material when they die.

All ponds over time evolve into dry land. This process is sharply accelerated by human activity. The same organic and inorganic fertilizers that turn lawns green and gardens lush turn ponds green and lush. This acceleration is known as *eutrophication*, which roughly translates as "good growth." Good growth, of course, in the wrong place.

Weeds in Morses Pond tangle tillers and centerboards and make sailing a chore rather than a pleasure. Swimming is affected by algal reproductive bursts, called blooms, which, added to the pondwater's tea color, can reduce transparency below the state's 4–foot standard for swimming in a matter of hours.

Controlling pondweed and algae is a delicate balancing act. When algal counts are low and the water is clear, sunlight penetrates deeply so that weeds like milfoil grow rapidly. When the water is murky with algae and sunlight cannot penetrate, pondweed growth slows down.

## WEED PREVENTION AND CONTROL

Lawn fertilizer has been identified as the major culprit for rapid eutrophication of the Pond. The phosphates and nitrates which stimulate grass growth stimulate pondweed growth. The best way to reduce weed growth in Morses Pond is for

4

homeowners in the watershed to minimize the use of inorganic fertilizers. All homes around Morses Pond should plant buffer strips of unfertilized groundcover or shrubs between their lawns and the Pond to prevent fertilizer runoff.

Septic system effluent is the second largest source of nutrients stimulating weed growth in Morses Pond. During a sewer hookup campaign in the seventies, most homes abutting Morses Pond were connected either to the Wellesley or to the Natick sewer systems. Three homes on the Pond are currently unsewered. About 75 upstream homes in Wellesley are unsewered.

Treating the Pond with herbicides masks the symptoms of eutrophication but does not address the causes. In fact, killing weeds without removing them just fertilizes further growth. Copper sulfate is the primary weedkiller. Its continued use adds copper to the bottom sediments where it may be drawn into the wells.

The 1975 Camp Dresser & McKee "Morses Pond Eutrophication Study" recommended the use of aluminum sulfate—alum, the substance that is sometimes used to crisp pickles—to settle suspended algae to the bottom. At the same time the consultant cautioned that solids settling on the bottom might form a sealant blanket, potentially interfering with well flow. Jerome B. Carr recommended potassium permanganate to decolorize the water; he also recommended town acquisition of two wetlands bridging Lexington Road along Route 9, the Overholser wetlands to the east and the Guiney Swamp to the west.

Wellesley bought the Overholser property (now Overbrook Reservation) in 1978 but negotiations to buy the Guiney Swamp failed. The surrounding uplands were developed. Guiney Swamp was finally acquired and renamed Baird Marsh in 1994.

*Controlling pondweed and algae is a delicate balancing act. When algal counts are low and the water is clear, sunlight penetrates deeply so that weeds like milfoil grow rapidly. When the water is murky with algae and sunlight cannot penetrate, pondweed growth slows down.*

Between 1976–79, with funding from the US EPA, the State Division of Water Pollution Control and the town, Wellesley undertook a $700,000 dredging project to remove accumulated sediments and organic nutrients from the bottom of Morses Pond. First a big pump on a barge sucked watery ooze from the bottom. Then a system of floating pipes carried the slurry south to an enormous settling basin constructed on Wellesley College property to the east of Paintshop Pond. Finally the water passed through a sand and fabric filter into Waban Brook downstream of Paintshop Dam.

The dredging project was not an outstanding success. While it deepened the pond, extending the area open to sailboats and making room for more sediment, it also spread waterlilies and pondweed into new areas.

Still determined to find an answer, the town bought a weed harvester in 1980—a kind of barge-mounted, underwater mowing machine. The harvester does not leave weed clippings to fertilize the pond; instead, they are removed bargeload by bargeload. Although this is labor-intensive, expensive work, the town now "mows" a portion of the pond each summer. Unfortunately, the weed harvester is least effective in the shallow shoreline and beach areas where resident interest is greatest.

Morses Pond has been monitored annually since 1980 by IEP. Liquid alum has been used to coagulate and settle algal blooms; copper sulfate crystals are used for pre-bloom control. At the insistence of water supply consultants, potassium permanganate is no longer used. In the beach area milfoil is hand-pulled by Scuba divers.

The July 1992 Amory Engineers' "Update of the Comprehensive Water Supply Study" reported that, while copper is not an immediate concern, there is a

5

substantial buildup of aluminum in pond sediments which is migrating to the town wells in excess of the EPA guideline figure. This migration is aggravated by acidic conditions caused in part by the alum itself. Amory Engineers recommended that alum treatment be discontinued for five years to see if aluminum concentrations decline.

## POLLUTION & POLLUTION CONTROL

The words "drainage basin" and "watershed" take on real meaning when you realize that all soluble materials put on the ground in the Morses Pond watershed end up in the Pond. And then, when you know that the Pond contributes two-thirds of the water we drink from the Morses Pond wells, you understand why we must reduce the amount of fertilizers, pesticides, septic effluent, road salt and hydrocarbons (oil, gasoline, transmission fluid) entering the Pond.

Road Salt. To address the problem of road salt, the town restricts salt use in Wellesley's watershed areas. However, the town has no control over the use of road salt on Route 9, a state highway, where over-salting is frequently reported. As a result, after snowy or icy winters salt levels rise in our drinking water. With abundant rain, the salt levels drop again.

Gasoline. To address the potential for gasoline seepage, the Natural Resources Commission in 1984 undertook an inventory of underground fuel tanks along Route 9. It was found that most of the tanks were old and in danger of leaking. Consequently, the Board of Health adopted today's Underground Fuel Tank Regulations, which are enforced by the Fire Chief. The Wetlands Protection Committee monitors Route 9 to ensure that road sweepings full of hydrocarbons and road salt are no longer disposed of in Morses Pond wetlands.

Zoning Protection. In another joint effort by Natural Resources, Public Works and the Health Department, a proposal for zoning protection of the town's two major aquifers was developed. Town

Meeting adopted the proposed *Morses Pond and Rosemary Brook Water Supply Protection Districts* in 1987. This zoning bylaw (Section XIVE) specifies acceptable land uses within the town-owned portions of the watersheds of town wells at Morses Pond and Rosemary Brook.

Despite all these precautions, Morses Pond and its wells remain vulnerable to any chemical spill along Route 9 between the Weston Road intersection and the descriptively-named Sunkaway in Natick, which feeds Jennings Brook.

Septic Systems. Fecal contamination of the Pond from properly constructed and located septic systems would not be a problem, but many older septic systems in Wellesley were constructed before Title 5 regulations were adopted. Some of these old septic systems may be no more than cesspits or may be periodically submerged in groundwater. Nevertheless, due to their distance from the Pond, Wellesley septic systems in general pose a greater threat of nutrient loading than of fecal contamination.

To reduce this problem, a low-interest loan program was initiated by Public Works in 1990 to encourage homeowners in Water Supply Protection Districts to connect to the town sewer system. In addition, Public Works will pay up to 62.5% of the cost of connecting a house to the sewer line. Interested homeowners should contact the DPW Water & Sewer Division for full information.

Aside from septic systems, there are two other potential sources of fecal contamination of Morses Pond: overflow from the Dale Street sewage pump station, and—yes—Canada geese.

Dale Street Sewage Pump Station. The Dale Street sewage pump station is located just south of Route 9 and east of the Cochituate Aqueduct. In times of high water it may be necessary to sandbag the manhole to which the station discharges to prevent overflow to the Pond. This has not been a

6

major problem due to the extreme dilution factor during flood flows combined with intensified chlorination at the wells.

CANADA GEESE are browsing birds and are strongly attracted to the grassy areas that beach-goers and picnickers enjoy. Their messy droppings must be cleaned up daily before the beach opens for aesthetic reasons and to prevent high coliform readings. Canada geese are federally protected as migratory birds, but a collaring study now underway indicates that many Canada geese have become resident.

Abolishing grass, stringing landing obstruction wire, and providing sight barriers are all deterrents to Canada geese but are not useful strategies at the town beach. Addling (shaking) eggs during the period the birds are flightless is frowned upon unless populations are much denser than is the case at Morses Pond. The town uses sprinkler systems at erratic intervals and has even rented swans, which are fiercely territorial during the breeding season. Perversely, the swans have chosen to nest in the north end where geese are not a problem.

The town has also tried dogs, which work well but require constant supervision. Currently, the best defense remains:

### Don't feed the geese!

## FLOODING & FLOOD CONTROL

The discharge capability of the Morses Pond outlet has deteriorated through the years while flooding potential has increased with increasing development.

According to hydrologist Elliot F. Childs' 1978 study, the original portion of the Morses Pond outlet culvert is now almost 160 years old. Its two extensions and partial concrete lining make the culvert a patchwork of different designs and cross-sections. Although the opening appears large, there is a bottleneck in the middle and the space at the top of the arch can't be used because a pond that high would cause extensive property damage. According to Childs, the effective waterway at the critical encasement is only 37% of the original area. There is a potential for blockage. Even partial blockage could cause significant flood damage during times of high runoff.

As a consequence of the Childs' report, the firm of Camp Dresser & McKee was retained to study the outlet culvert. Their 1981 report found the culvert to be structurally sound. In 1983 the culvert was inspected again by representatives from Wellesley, Conrail and the MBTA, and, after some argument over responsibility, Conrail repointed the masonry at a cost of $10,000.

> *The discharge capability of the Morses Pond outlet has deteriorated through the years while flooding potential has increased with increasing development.*

But structural integrity and floodflow passage are different though related issues. The 1981 CDM report confirmed Childs' finding that the culvert is too small for safety—in the 100-year storm, they said, 36 homes around Morses Pond may be flooded because the pond cannot drain fast enough. To lessen the flooding potential and to gain greater control over pond levels, CDM recommended the following steps to allow passage of the 100-year flood:

- Construction of a new dam north of Central Street
- Construction of a second outlet culvert
- Replacement of Paintshop Dam
- New culverts under Route 9 and the Cochituate Aqueduct.

It was estimated that these improvements would cost $3.2 million dollars. The pricetag was too high for

Wellesley alone, but, after years of effort, the project was included in the State Transportation Bond Act §3Q of 1988 to relieve flooding on Route 9. The State Highway Division's consultant, Rizzo Associates submitted the study called for by April of 1994, but as of April 1996, the study had not been released by the Highway Division.

Together with the Natural Resources Commission, the Wetlands Protection Committee, state agencies, other town boards, Wellesley College, Route 9 business interests and the Friends of Morses Pond, local residents and pond users will be involved in evaluating the project's environmental impacts.



## THE SEARCH FOR SOLUTIONS

Morses Pond is one of Wellesley's primary natural, recreational and scenic resources. It has many constituents: homeowners—many of whom are active in the Morses Pond Association—commercial interests, swimmers, sailors, fishermen, birders, photographers, iceskaters, artists, outdoor enthusiasts. The Pond provides open space and vistas for everyone. It yields good water for drinking, cooking and commercial purposes.

But Morses Pond also provides drainage for an 8.8 square mile watershed, including industry in Natick, the business area just north of the pond, and several miles of heavily-travelled Route 9.

As a result, major studies of the Pond have been undertaken by the town every few years since the '60s. A list of these studies and reports is available from the Natural Resources office in Town Hall.

Annual monitoring reports were started in 1980 in order to:

· minimize chemical treatments
· evaluate impacts of chemical algae control

· detect changes in pondweed abundance and species
· detect migration of aluminum or copper into the groundwater and wells
· detect water quality trends to protect the recreational resource.

The pond is actively managed by the Department of Public Works to protect **water supply, drainage** and **recreation,** in that order. The town's present water consultant, Amory Engineering, urges that use of chemicals be kept to an absolute minimum, a recommendation concurred in by pond monitoring consultant IEP, which is now part of Fugro-McClelland East.

Given the conflicting demands on the Pond, a necessary tension exists between the town's recreation and water management interests. For example, lifeguards prefer transparency above the mandatory four feet in order to see the bottom in the deepest area. The lifeguards' water safety interest conflicts with the consultants' professional advice not to use chemicals unless absolutely necessary. Beachgoers also want quick chemical treatment when the algae or pondweed is thick, but experienced water quality consultants recommend wait-and-see.

In an effort to find a better way, the 1988 Morses Pond Study Committee reviewed *all* the pond studies. Their report urged that planning for the new dam and culvert system be continued. They also obtained $32,000 from Town Meeting for a study designed to find out if there is a practical way of controlling nutrient and sediment loading from Bogle, Boulder and Jennings Brooks.

That study was undertaken in 1989 by IEP. The *"Morses Pond Tributary Study"* focussed on watershed management. It recommended a feasibility study of using Reed's Pond, portions of Kelly Park, and other upstream wetlands as nutrient and sediment traps. Funds for the feasibility study were voted by Town Meeting in 1992. A pilot project is planned for the spring of 1996.

8

According to IEP's 1991 monitoring report, water transparency that summer ranged between a satisfactory 5.2 feet to an enjoyable 11.0 feet even though the pond was not treated at all. This shows that pondweed and algal growth, like garden growth, is strongly affected by rainfall and temperature cycles.

However, for unknown reasons, pond alkalinity dropped markedly. Since alkalinity is a measure of buffering capacity, this requires watching. It may indicate that the Pond is becoming more sensitive to acidification.

## THE NEW DAM PROJECT

The new dam project gives Wellesley the opportunity to address drainage and flood control issues at Morses Pond for the first time. The project does *not* directly address recreational issues, though the possibility of lowering the water level in winter to freeze and scrape the weeds off the bottom around the edges of the Pond has been suggested. This idea should be viewed with great caution because of potential adverse effects on town wells. A study of this relationship is scheduled.

Murphy's Law states that "If anything can go wrong, it will." Beyond a doubt, blockage or failure of the outlet culvert is possible. Beyond question, the ability to drain the Pond more rapidly would help to limit flood damage during major storms. If the dam project is implemented as planned, it is expected to reduce the frequency of flooding for six homes on Lexington Road and to prevent Route 9 traffic flow from being interrupted.

On the other hand, the project will require land takings at the north end of the pond and at Bacon Street. Its effects on Morses Pond residents and commercial interests have yet to be evaluated. The project may also require Wellesley College's consent for work on historic Paintshop Dam and the culverts leading to Lake Waban.

## CREATING THE FUTURE

Morses Pond, where so many of us learned to swim or sail, needs regular care and attention to maintain its quality as our primary water supply and recreational resource. Everything we do in the watershed either degrades the Pond or makes it cleaner and more beautiful. *The choices are ours.* 🖋



Town of Wellesley
NATURAL RESOURCES COMMISSION
(617) 431–1019 Ext. 294
Judith A. Nicolson, Director
6/93 Revised 4/96

*Copy obtained by Stephen Johnson on 2/98.*

9



MORSES POND WATERSHED

# NOTES



**Exhibit 2**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)     Civil Action No. 05 CV 11827-RWZ<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF GREGORY DAIN

1. I, Gregory Dain, am a Senior Enforcement Counsel with EPA Region 1 and have been assigned to work on the Morses Pond Culvert Superfund Site ("Site").

2. The attached EPA Responsiveness Summary, which is contained in EPA's Site file, is a true and accurate copy of EPA's response to the October 24, 2005 comments submitted by American Premier Underwriters, Inc. concerning the Consent Decree in this matter.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

/s/ Gregory Dain          3/3/06
Gregory Dain              Date

**EPA Responsiveness Summary; Exhibit 2**

I. <u>Introduction</u>

This Memorandum provides the response of the U.S. Environmental Protection Agency ("EPA") to the public comments received on the proposed Consent Decree ("Consent Decree") in United States of America v. Massachusetts Bay Transportation Authority (Civil Action No. 05-11827 RWZ).  The Consent Decree addresses the Massachusetts Bay Transportation Authority's ("MBTA") liability under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607(a), for  costs incurred by the United States at the Morses Pond Culvert Superfund Site in Wellesley, Massachusetts (the "Site").

The United States lodged the proposed Consent Decree with the United States District Court for the District of Massachusetts on September 8, 2005.  In accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), the United States published notice of the proposed Consent Decree and the commencement of a thirty-day public comment period in the Federal Register on September 22, 2005 (70 Fed. Reg. 5626).  The United States received one set of comments during the public comment period, on October 24, 2005, from Benjamin G. Stonelake, Jr. of Blank Rome LLP, counsel for American Premier Underwriters, Inc.  (A copy of the comments is attached as Exhibit 1 to the United States' Memorandum in Support of its Motion to Enter the Consent Decree.)  On November 1, 2005, the United States filed a Complaint against American Premier Underwriters, Inc. ("APU") in the United States District Court for the District of Massachusetts, alleging that APU is liable under Section 107(a) of  CERCLA, 42 U.S.C.

1

§ 9607(a), for the costs incurred by the United States at the Site.  A summary of APU's comments and EPA's responses are set forth in Section III below.

## II.  Background

The proposed Consent Decree has been signed by the MBTA, which owns a portion of the Site property and operates a railroad line located at the Site.  The highest levels of chromium contamination at the Site were found in material that was physically a part of the railroad embankment that supports the railroad line.  The evidence gathered by EPA indicates that material contaminated with chromium was disposed of at the Site prior to the MBTA's acquisition of the Site in 1973.  In 2000-2002, EPA removed in the range of 600 to 800 tons of contaminated material from the railroad embankment.  In order to preserve the structural integrity of the railroad tracks, EPA also left many more tons of contaminated material in the railroad embankment.  That remaining contaminated material was treated in situ and a protective cap was placed over it.

The Site is located in Wellesley, Massachusetts.  The Site includes the following areas: the railroad embankment located in the vicinity of the culvert at the south end of Morses Pond, the cove at the south end of Morses Pond, the 192-foot culvert that allows water to flow from the south end of Morses Pond to the north end of Paintshop Pond (under the railroad tracks and Central Street), property adjacent to the cove at the south end of Morses Pond, and a residential property located at One Bacon Street.  The Site is abutted to the north by the remainder of Morses Pond, to the south by railroad tracks and Paintshop Pond, to the northeast by a recreational town beach, to the east by undeveloped land, and to the west by Bacon Street.

The MBTA currently owns the railroad embankment as well as a small portion of Morses Pond located adjacent to the northern end of the culvert.  The MBTA acquired this property on January 17, 1973, when it purchased the property from the Penn Central Transportation Company ("PCTC") in connection with PCTC's bankruptcy proceeding.[1] The Town of Wellesley owns a portion of the shore line of Morses Pond in the vicinity of the culvert, a portion of the pond itself, and the dam located at the outlet of the culvert where water drains into Paintshop Pond.  The Bacon Street Realty Trust owns the residential property located to the west of the culvert.

In 1994, the Massachusetts Department of Environmental Protection ("MADEP") discovered that the Site was contaminated with extremely high levels of chromium, including hexavalent chromium.  In 1996, MADEP installed a perimeter fence and "No Trespassing" signs.  In 1998, MADEP placed a geotextile fabric on the Site and installed monitoring wells.

EPA conducted a CERCLA removal action at the Site in 2000 - 2002 which included (a) soil testing, (b) installation of a coffer dam, 24 dewatering wells, and a bypass pumping system to drain water from the cove in Morses Pond and the culvert, (c) excavation and off-Site disposal of contaminated sediment located in the cove and culvert, (d) construction of sheet piling to retain the railroad embankment, (e) excavation and off-Site disposal of contaminated soils located in the railroad embankment and surrounding area, (f) in-situ treatment of contaminated soil in the railroad embankment located at a depth below four feet, (g) installation of a cap in the railroad embankment excavation area,  and (h) Site restoration.  The total cost of the removal action was about $4 million.

---

[1] In 1994, PCTC changed its name to American Premier Underwriters, Inc.

As stated earlier, the highest levels of chromium contamination at the Site were found in material that was located in and was structurally a part of the railroad embankment or berm. In the range of 600 to 800 tons of contaminated material was removed by EPA from the railroad embankment. Some of the contaminated material in the embankment could not be removed and had to be left in place due to engineering concerns about the structural integrity of the railroad line.

A railroad line has run by the shore of Morses Pond, where the Site is located, since the 19th century. APU itself, or its predecessor railroad companies, owned and/or operated that railroad line for about 140 years, from about 1835 until January 17, 1973, when PCTC sold this portion of the railroad line to the MBTA. The United States has alleged, in United States v. American Premier Underwriters, Inc., No. 05-CV-12189 RWZ, that the disposal of hazardous substances took place at the Site in the 1890's (or at some point in time thereafter but prior to January 17, 1973), when the Site was owned and/or operated by APU (or one of its predecessors).

The proposed Consent Decree will resolve the liability of the MBTA for its ownership of a portion of the Site property in return for a payment of $150,000. Conditioned on the MBTA's satisfactory performance of the Consent Decree, the United States covenants not to sue the MBTA pursuant to CERCLA section 107(a), 42 U.S.C. § 107(a), for Past Response Costs, which are defined as all costs incurred by EPA, or DOJ on behalf of EPA, in connection with the Site through the entry of the MBTA Decree.

As described below in EPA's responses to APU's comments, the proposed Consent Decree is based on EPA's assessment of the MBTA's liability at the Site and EPA's belief that the proposed settlement is fair, reasonable and in the public interest.

4

III.  <u>Response to APU's Comments</u>

APU's comments are organized into five main sections, each containing numerous points or statements.  APU's comments in each main section are not always clearly identified as distinct comments, are not individually numbered, and sometimes overlap with comments in other sections of its submission.  Accordingly, EPA's responses are organized into five main sections, but are not individually numbered.

**Section I (Entitled by APU as "Statement of APU's Position").**

**Comment:**   APU objects to the Consent Decree because it claims EPA has not conducted an appropriate investigation of the facts and law applicable to identification of potentially responsible parties ("PRPs") for the contamination at the Site.

**Response:**  EPA disagrees that it has not conducted an appropriate investigation.  EPA's factual investigation and associated legal analysis spanned the course of more than four years, from 1999 to 2003.  EPA focused its investigation on all the owners and operators of the Site beginning in the mid 19th century until the present, consistent with the liability scheme set forth in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).  As part of its investigation, EPA issued formal information requests, under Section 104 of CERCLA, 42 U.S.C. § 9604, to six different parties, including the MBTA and APU.  EPA received boxes of information from these six parties.  EPA obtained additional information from other sources.  EPA carefully evaluated the potential liability of each PRP.

**Comment:**  APU objects to the Consent Decree because EPA has not established an equitable allocation of responsibility among the PRPs for the costs incurred by the United States at the Site.

**Response:**   EPA did consider equitable factors in determining an appropriate settlement

for the MBTA.  After its thorough four-year investigation, EPA determined, based on its

review of the evidence, that the MBTA was not the owner of the Site when the

contaminated material was placed at the Site.  It appears that no construction work has

been performed at the lower portion of the embankment since the MBTA acquired the

property and there is no evidence indicating that a third-party dumped waste material on

the property at any time since the MBTA acquired the property.[2]  Rather, the evidence

indicates that the contaminated material was placed at the Site during the 1890s, or at

some point in time thereafter (but prior to January 17, 1973), when APU (or one of its

predecessors) owned and/or operated the railroad line and owned the portion of the Site

where the contaminated material was placed.  EPA's determination concerning which

party owned and operated the Site at the time of disposal played a significant role in

EPA's assessment of an appropriate settlement amount for the MBTA.[3]

       Finally, as a strictly legal matter, the United States is not required to prepare a site

allocation for all of the PRPs at the Site in order to determine that the settlement with the

MBTA is appropriate.  In fact, EPA generally does not prepare allocations of liability at

Superfund sites, even at sites, unlike this one, where such "percentage" allocations can be

prepared based on waste-in lists or similar evidence.[4]  Such allocations, if they are

---

[2]   The fact that 600 to 800 tons of contaminated material were located in and were structurally a part of the railroad embankment indicates that contaminated material was not simply dumped by a third-party on an uncontaminated railroad embankment.

[3]    EPA also considered the liability case against the other PRPs at the Site and determined that APU was the only PRP that could be held liable as the owner/operator of the Site at the time of the disposal of hazardous substances at the Site.

[4] In settlements where PRPs are agreeing to implement a remedial action, CERCLA provides that EPA "may . . . provide a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible

prepared at all, are generally developed by PRP groups.  Moreover, liability under

CERCLA is joint and several.

　　　The settlement also avoids certain litigation risks.  Litigation risk is a factor that

the EPA may consider in determining whether a settlement is appropriate.  Although

CERCLA does impose liability upon the current owners of Superfund sites, such as the

MBTA,  see Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), a landowner can

avoid liability, based on CERCLA's "innocent landowner" defense, if it can show that

the hazardous substances were disposed of prior to the time it acquired the property, that

it did not know or have reason to know of the prior contamination at the time it acquired

the property, and that it exercised due care with respect to the hazardous substances.  The

MBTA has vigorously asserted that it is entitled to rely on the "innocent landowner"

defense.

　　　Based on this litigation risk, and based on the MBTA's role at the Site, EPA

believes the Consent Decree payment is appropriate.

**Comment:**  APU objects to the Consent Decree because: 1) EPA has agreed to settle

with the MBTA for a smaller amount of money than the United States rejected in the

context of a settlement offer from APU; 2) EPA is providing the MBTA with

contribution protection; and 3) because, APU asserts, APU has equal or better defenses

than the MBTA to the same claims.

**Response:**  As described earlier, there is a critical difference between the MBTA's and

APU's relationship to the Site and the circumstances surrounding the disposal of

---

parties at the facility."  Section 122(e)(3)(A), 42 U.S.C. § 9622(e)(3)(A) (emphasis
added).   There is no requirement that EPA prepare such an allocation.

hazardous substances, i.e., each party's period of ownership and operation of the Site in relation to the timing of the disposal of hazardous substances or contaminated material. Accordingly, both the amount of the settlement with the MBTA and the fact that the MBTA is receiving contribution protection is fair and appropriate under the circumstances.

The gist of APU's argument is not that the MBTA is paying too little, but rather that the EPA should be required to settle with APU on terms similar to the MBTA settlement. But the Court may not force the United States to settle with APU, much less force the United States to settle with APU for any particular amount. In addition, EPA disagrees that APU has equal or better defenses than the MBTA. The simple but critical distinction between the MBTA's and APU's  period of ownership and operation of the Site, in relation to the timing of the disposal of hazardous substances at the Site, is enough to refute APU's assertion. In any event, this is not the appropriate context or forum for APU to raise these issues. APU will have an opportunity to do so in response to the Complaint filed against APU by the United States.

**Section II (Entitled by APU as "Background").**

**Comment:** In this section of APU's comments, APU raises the following points: 1) the United States failed to bring its claim against APU within the statute of limitations; 2) the United States' view of the factual circumstances surrounding the disposal of contaminated material at the Site is incorrect; 3) APU does not concede that it is the successor to railroad entity that owned and operated the railroad line at the time the disposal of hazardous substances occurred; 4) other PRPs have liability at the Site; and 5)

that the United States's CERCLA claim is barred or was discharged under principles of
bankruptcy law.

**Response:** Each and every comment made by APU in this section of its comments
relates to APU's view that the United States allegedly has a weak case against APU. As
stated earlier, however, this is not the appropriate context or forum for APU to raise these
issues. APU will have an opportunity to do so in response to the Complaint filed against
APU by the United States. These comments do not address the critical issue here,
whether or not the settlement with the MBTA is fair, reasonable, and in the public
interest.

**Section III (Entitled by APU as "EPA's case against all the PRPs is similarly weak
due to a lack of evidence of when the contamination actually occurred and,
therefore, which parties are liable under CERCLA").**

**Comment:** The issues raised by APU in this section of its comments do not deal directly
with the proposed Consent Decree with MBTA, but rather include considerable detail
regarding why APU believes the United States' case against APU is allegedly weak from
a factual perspective, i.e., APU asserts that the United States cannot meet its burden of
proof with regard to when the disposal of hazardous substances occurred.

**Response:** EPA does not agree with APU that its case against APU is weak. APU's
comments list numerous factors or assumptions that APU states the United States must
address to find APU liable. However, as stated earlier, this responsiveness summary is
not the appropriate forum to litigate or prove APU's liability. APU will be given its
chance to raise these issues in the case being brought by the United States on behalf of
EPA. Accordingly, EPA will not respond here to the various factual issues raised by

APU concerning its own liability.  That being said, however, EPA submits that it will be able to prove that contaminated fill material was placed on property owned and/or operated by APU (or one of its predecessors), and that this disposal took place in the 1890s, or at some point in time thereafter (but prior to January 17, 1973).

**Section IV (Entitled by APU as "APU's liability to EPA is even more tenuous than that of MBTA").**

**Comment:**  In this section of APU's comments, APU essentially argues once again that the United States' factual case is insufficient to prove APU's liability at the Site, and that, in any event, APU could nevertheless not be held liable based on principles of bankruptcy law.

**Response:**  As already stated, EPA disagrees that the United States' factual case is insufficient to prove APU's liability at the Site, and also disagrees that APU could not in any event be liable at the Site based on principles of bankruptcy law.

Again, each and every comment made by APU in this section of its comments reflects APU's view that there are problems with the United States' case against APU, but fails to address whether or not the settlement with the MBTA is fair and reasonable under the circumstances.  As stated earlier, this is not the appropriate context or forum for APU to raise these issues.  APU will have an opportunity to do so in response to the Complaint filed against APU by the United States. [5]

---

[5]  On January 6, 2006, APU filed a Motion to Dismiss the Complaint filed by the United States and asserted that the United States' claim was barred by the statute of limitations and that the action should be transferred to the United States District Court of the Eastern District of Pennsylvania to determine whether the United States's claim was barred by the consummation order issued in APU's bankruptcy proceeding. On February 15, 2006, the United States files an opposition to APU's motion as well as a cross-motion for summary judgment in its favor on the statute of limitations issue.

**Section V (Entitled by APU as "The Consent Decree is arbitrary and capricious and should not be approved").**

**Comment:**  APU essentially asserts in this section of its comments that the Consent Decree is not fair to APU because it is not based upon a fair apportionment of responsibility as between the MBTA and APU.  The points raised by APU in this section are in essence the same points already raised by APU in Section I of its comments.

**Response:**  EPA disagrees that the Consent Decree is arbitrary and capricious in that it is not based upon a fair apportionment of responsibility as between the MBTA and APU. EPA's response to this assertion is already set forth above.

# Exhibit 3



BASE MAP IS A PORTION OF THE FOLLOWING 7.5 X 15' U.S.G.S. QUADRANGLE(S):

FRAMINGHAM, MASSACHUSETTS. 1978. PHOTOREVISED 1987.

QUADRANGLE LOCATION

# SITE LOCATION MAP

## MORSES POND CULVERT SITE
## WELLESLEY, MASSACHUSETTS

**WESTON SOLUTIONS**
Restoring Resource Efficiency

| TDD # | DRAWN BY: | DATE: |
|---|---|---|
| 02-05-0032 | K. BRENNAN | 06/04/2002 |
| FILE NAME: | | |
| R:02050032/4190_FIG1.APR | | FIGURE 1 |

2

# Exhibit 4

MORSES POND

Wellesley Public
Water Supply Wells

ICE POND

Town
Beach

Sediment to
be Excavated

Planned
Coffer Dam

MBTA Tracks

Route 135

WELLESLEY
COLLEGE

Soil to be
Excavated

Culvert

WELLESLEY
COLLEGE

Paint Shop
Pond

WELLESLEY
COLLEGE

Former Henry Woods
Paint Factory

WELLESLEY
COLLEGE

LAKE
WABAN

# Exhibit 5



SITE DIAGRAM AND
SOIL BORING LOCATION MAP

MORSES POND CULVERT SITE
WELLESLEY, MASSACHUSETTS

REGION I SUPERFUND TECHNICAL ASSESSMENT AND RESPONSE TEAM

| TDD # 02-05-0032 | DRAWN BY: BUTTERWORTH | DATE 6/4/02 |
| --- | --- | --- |

FILE NAME:
R:\02050032\fig2.dwg

FIGURE 2

LEGEND

• SOIL BORING LOCATION
CONC/WOOD GUARD RAIL
CHAIN LINK FENCE
SHORE LINE
BUILDING LINE
STONE RETAINING WALL
PROPERTY LINE
PROPOSED LIMITS OF EXCAVATION/
EXTENT OF CONTAMINATION

# Exhibit 6



PROFILE ALONG CULVERT

APPROXIMATE SCALE

CENTRAL STREET

ORIGINAL CULVERT FLOOR
EL. 113.0' (APPROX.)

WSE
120.04'
(APRIL 2000)

NO SEDIMENT

RAILROAD

TOP OF HEADWALL

FLOW

| DISTANCE FROM MORSES POND CULVERT (FEET) | 0 | 21 | 42 | 64 | 106 | 128 | 149 | 170 | 192 | 194 |
|---|---|---|---|---|---|---|---|---|---|---|
| SAMPLE NO. | CS01 | CS02 | CS03 | CS04 | CS06 | CS07 | CS08 | CS09 | CS10 | CS05 |
| AVERAGE SEDIMENT DEPTHS (FEET) | 1.33 | 0.72 | 1.33 | 2.22 | 2.22 | 3.25 | 3.75 | 4.25 | 2.67 | 3.5 |

EL. 130.64'
EL. 125.54'
EL. 163.10'
EL. 123.85'
EL. 122.34'
EL. 123.85'
EL. 137.55'
EL. 126.04'

NOTE:

THE INFORMATION OTHER THAN SEDIMENT DEPTH
PROVIDED ON THIS FIGURE IS FROM HISTORICAL
DATA AND THE ACCURACY OF THIS DATA
REMAINS TO BE VERIFIED.

| | OFFICE | DRAWING NUMBER | 799008-A1 |
|---|---|---|---|
| | Pittsburgh, PA | | |

MASSACHUSETTS DEPARTMENT
OF ENVIRONMENTAL PROTECTION
WILMINGTON, MASSACHUSETTS

CULVERT CROSS SECTION
MORSES POND
WELLESLEY, MASSACHUSETTS

IT CORPORATION

| DESIGNED BY | DCH | CHECKED BY | |
|---|---|---|---|
| DRAWN BY | B.B.O'Connor | APPROVED BY | |
| SCALE: | | DRAWING NO. | |
| AS SHOWN | | 799008-A1 | |

7/26/00
7/31/00

FIGURE NO.
7

REVISION NO.

| REV | DATE | BY | CHK'D | APP'D | DESCRIPTION/ISSUE |
|---|---|---|---|---|---|

O:\Project\799008\799008A1.dwg
Plot Date/Time: 08/09/00 03:06pm
Format Revised: 12/15/99

Image: SCAN-1
Xref:    SCAN-2

# Exhibit 7

## PHOTOGRAPHY LOG SHEET
### Morses Pond Culvert Site • Wellesley, Massachusetts



**SCENE:** View of culvert and contaminated embankments prior to removal activities.  Photograph taken facing southwest.

**FRAME NUMBER:** 06  **DATE:** 10 April 2001          **TIME:** 0906      **SKY CONDITION:** Sunny
**PHOTOGRAPH BY:** Mandy Butterworth          **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus      **SETTING:** Automatic      **FILM TYPE:** 35-mm      **FILM ROLL:** 4787



**SCENE:**  View of silt fence and hay bales installed along the eastern shoreline of the cove for erosion control purposes.  Photograph taken facing south.

**FRAME NUMBER:** 13A  **DATE:** 18 April 2001          **TIME:** 1459      **SKY CONDITION:** Sunny
**PHOTOGRAPH BY:** Mandy Butterworth          **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus      **SETTING:** Automatic      **FILM TYPE:** 35-mm      **FILM ROLL:** 4787

## PHOTOGRAPHY LOG SHEET
### Morses Pond Culvert Site • Wellesley, Massachusetts



**SCENE:** View of bypass piping being positioned through the culvert. Photograph taken facing south-southeast.

**FRAME NUMBER:** 07   **DATE:** 6 June 2001          **TIME:** 1512     **SKY CONDITION:** Partly Cloudy
**PHOTOGRAPH BY:** Mandy Butterworth               **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus      **SETTING:** Automatic      **FILM TYPE:** 35-mm      **FILM ROLL:** 6092



**SCENE:** View of bypass pump intakes being installed. Photograph taken facing northeast.

**FRAME NUMBER:** 05   **DATE:** 11 June 2001         **TIME:** 1440     **SKY CONDITION:** Overcast
**PHOTOGRAPH BY:** Mandy Butterworth               **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus      **SETTING:** Automatic      **FILM TYPE:** 35-mm      **FILM ROLL:** 0502

## PHOTOGRAPHY LOG SHEET
### Morses Pond Culvert Site • Wellesley, Massachusetts



**SCENE:** View of vactor truck used to remove sediment from the culvert. Photograph taken facing east.

**FRAME NUMBER:** 24  **DATE:** 28 June 2001        **TIME:** 0913    **SKY CONDITION:** Sunny
**PHOTOGRAPH BY:** Mandy Butterworth            **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus    **SETTING:** Automatic    **FILM TYPE:** 35-mm    **FILM ROLL:** 0813

**SCENE:** View of the culvert, after the sediment removal, showing steel shoring and bypass piping. Photograph taken facing northwest.

**FRAME NUMBER:** 12  **DATE:** 7 July 2001        **TIME:** 0910    **SKY CONDITION:** Indoors
**PHOTOGRAPH BY:** Mandy Butterworth            **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus    **SETTING:** Automatic    **FILM TYPE:** 35-mm    **FILM ROLL:** 0982

# PHOTOGRAPHY LOG SHEET
## Morses Pond Culvert Site • Wellesley, Massachusetts



**SCENE:** View of culvert flooded after removal and pumping activities. Photograph taken facing south.

**FRAME NUMBER:** 22    **DATE:** 6 November 2001    **TIME:** 1503    **SKY CONDITION:** Partly Sunny
**PHOTOGRAPH BY:** Mandy Butterworth    **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus    **SETTING:** Automatic    **FILM TYPE:** 35-mm    **FILM ROLL:** 7878



**SCENE:** View of excavation activities in the eastern embankment. Photograph taken facing south.

**FRAME NUMBER:** 04    **DATE:** 8 January 2002    **TIME:** 1302    **SKY CONDITION:** Overcast
**PHOTOGRAPH BY:** Mandy Butterworth    **WITNESS(ES):** Frank Gardner
**CAMERA:** Olympus    **SETTING:** Automatic    **FILM TYPE:** 35-mm    **FILM ROLL:** 0753

# Exhibit 8

(In order to review exhibit, please magnify PDF file)



**PLAN REFERENCES**

1. BOSTON AND ALBANY RAILROAD, MAIN LINE, NATICK–WELLESLEY STATION 792+00 – 844+80  1"=100', JUNE 30, 1915 REVISED TO JUNE 30, 1917.  ON FILE WELLESLEY TOWN DPW.

2. LAND IN WELLESLEY, MASS SCALE 100 FEET TO AN INCH, OCTOBER 3, 1953. GLEASON ENGINEERING COMPANY. FILED AS PLAN 1382 OF 1953, BOOK 3208, PAGE 130. NORFOLK REGISTRY OF DEEDS.

3. PLAN OF LAND IN WELLESLEY, MASS SHOWING REVISED LOT LINE SCALE 1"=40' SEPT 24, 1957 BY MAC CARTHY ENGINEERING SERVICE, INC. FILED AS PLAN 1109 OF 1957, BOOK 3567, PAGE 538 NORFOLK REGISTRY OF DEEDS.

4. PLAN OF LAND IN WELLESLEY, MASS OWNED BY H. AMBROSE KNIGHTS TR. SCALE 1"=40'  DEC. 24, 1969 BY MAC CARTHY ENGINEERING SERVICE INC. FILED AS PLAN 345 OF 1970, BOOK 4658 PG 371, NORFOLK REGISTRY OF DEEDS.

5. PROPOSED RECONSTRUCTION OF DAM, OUTLET FROM MORSE POND WELLESLEY, MASS. BOSTON ICE CO., MAY 11, 1920  H.S. ADAMS, C.E. FILED AS NO 4656, PL. BK. 98 NORFOLK REGISTRY OF DEEDS.

6. PLAN OF LAND IN WELLESLEY AND NATICK MASS BELONGING TO THE WABAN ROSE CONSERVATORIES CORPORATION, SCALE 200 FEET TO AN INCH, OCTOBER 28, 1929 ERNEST W. BONDITCH, ENGR. PLAN 2415 BOOK 51, NORFOLK REGISTRY OF DEEDS.

7. PLAN OF LAND IN WELLESLEY AND NATICK MASS OWNED BY BOSTON ICE COMPANY, SCALE 100 FEET TO AN INCH, SEPTEMBER 1929 GLEASON ENGINEERING CORPORATION, PLAN 290 OF 1931, PL. BK. 113 NORFOLK REGISTRY OF DEEDS.

8. EXTENT OF LAND EXCEEDING APPLICABLE STANDARDS  MORSES POND WELLESLEY, MASSACHUSETTS, DATE 8/7/00 BY IT CORPORATION FOR MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION INCLUDING ORIGINAL TOPOGRAPHY BY : ASEC CORPORATION QUINCY, MASS. DWG NO. 944–01WS TITLED ." SURFACE WATER AND SEDIMENT SAMPLING" SCALE 1"=40' DATED 5/27/98 (REV NO. 1)

**MORSES POND**

N/F
BACON STREET REALTY TRUST
JAMIE MAROTTA, TRUSTEE

N/F
GEORGE KHORIKAN

N/F
TOWN OF WELLESLEY

N/F
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

16' WIDE RIGHT OF WAY

NORTH RAIL

N/F MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

RAILROAD BASELINE

N/F
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
(FORMERLY BOSTON AND ALBANY RAILROAD)

CENTRAL   (PUBLIC – VARIABLE WIDTH)   STREET

STATE ROUTE 135

1901 STATE HIGHWAY BASELINE

N/F
WELLESLEY COLLEGE

N/F
TOWN OF WELLESLEY

N/F
WELLESLEY COLLEGE

**LEGEND**

- ⊙ I.R.(S)    IRON ROD SET
- ⊗ GB(F)    GRANITE BOUND(FOUND)
- ———— PROPERTY LINE
- ———— RIGHT OF WAY LINE
- ———— LIMIT OF SAMPLING LINE
- ▦ RAILROAD TRACKS
- ✾24"OAK DECIDUOUS TREE
- ✲7"PINE CONIFEROUS TREE
- BENCH MARK

**GENERAL NOTES**

1. THE PURPOSE OF THIS PLAN IS TO PROVIDE SUPPLEMENTAL TOPO-GRAPHIC INFORMATION IN THE AREAS SHOWN ON THIS PLAN.  HORIZONTAL AND VERTICAL DATUMS ARE FROM REFERENCED PLAN NUMBER 8  ABOVE.

2. SITE BENCHMARK:  TBM — NAIL SET 2' UP IN 26" OAK
   ELEV. 125.40 (SEE NOTE 1)

3. THE CONTRACTOR SHALL CONTACT DIG SAFE (1–888–344–7233) AT LEAST 72  HOURS PRIOR TO ANY EXCAVATION.  NO UTILITIES WERE LOCATED OR SHOWN AS PART OF THIS SURVEY.

Title block:

**PARTIAL TOPOGRAPHIC SURVEY**
**MORSE'S POND**

Scale: 1" = 20'         DECEMBER 29, 2000

MORSE'S POND
WELLESLEY, MASSACHUSETTS

Prepared for: IT CORPORATION
BBC ELM STREET
HOPKINTON, MA  01748–1656

**LANDTECH**
**Consultants, Inc.**
Civil Engineers, Land Surveyors, Project Management
484 Groton Road, Unit #1          19 Harvey Road, Unit #19
Westford, MA 01886               Bedford, MA  03110
(978) 692-8100                   (603) 641-2677

| DATE | REVISION | BY |
|------|----------|-----|

Design  N/A
Draft   CHK
Check   CHK
Job. No.  00–211
Sheet  1 of 1
Dwg. No.  6401

SCALE IN FEET
0   20   40   60

Copyright © 2000

# Exhibit 9

# BLANK ROME COMISKY & MCCAULEY LLP

*Counselors at Law*

Delaware
Florida
Maryland
New Jersey
New York
Ohio
Pennsylvania
Washington, DC

Direct Dial:     513.362.8703
Email:          CONTE@BLANKROME.COM

April 25, 2002

## *VIA FEDERAL EXPRESS*

Gregory Dain, Esq.
Enforcement Counsel
Office of Environmental Stewardship
USEPA, EPA New England
SEL
One Congress Street
Suite 1100
Boston MA 02114-2023

Re:     *Morse's Pond Site, Wellesley, Massachusetts*

Dear Mr. Dain:

This is the response of American Premier Underwriters ("APU") to the United States Environmental Protection Agency's ("EPA") request, dated February 7, 2002, for information, pursuant to Section 104(e) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9604(e), for the Morse's Pond Site ("Site") in Wellesley, Massachusetts. APU was granted an extension of time in which to respond, up through April 25, 2002. This extension was confirmed by letter of April 5, 2002.

Please note that, in accordance with your concurrence provided during your telephone conversation with Thomas Jacobs of March 5, 2002, APU's response does not include or encompass all information or documents previously provided to APU by EPA. Additionally, pursuant to authorization provided by you during your telephone conversation with Mr. Jacobs of April 22, 2002, APU has not, at this time, provided responses to Requests No. 13(a), 13(b) and 13(c), pending EPA's review of APU's responses to the remaining requests. Also pursuant to your telephone conversation with Mr. Jacobs of April 22, APU's response is being forwarded directly to you. Finally, please note that over-sized documents submitted in conjunction with APU's responses are being forwarded to you under separate correspondence.

APU's efforts to provide complete responses have been hindered by the fact that U.S. EPA is seeking information relating to corporate entities and/or activities that may have existed and/or taken place decades ago. APU is in the process of searching its voluminous corporate archives, comprising thousands of boxes of documents, located in

BLANK ROME COMISKY & McCAULEY LLP

RESPONSE:

Documents pertaining to the "Boston Line" were transferred to the Massachusetts Bay Area Transit Authority ("MBTA") in conjunction with the sale of this property to MBTA by the Penn Central Transportation Company Bankruptcy Trustees in 1973. Additional responsive information may be obtained from persons or entities identified in documents provided to APU by EPA, in response to APU's Freedom of Information Act requests.

4.    If Respondent wishes to designate an individual for all future correspondence concerning this Site, including any legal notices, please so indicate here by providing that individual's name, address, telephone number, and FAX number.

RESPONSE:

Jonathan A. Conte, Esq.
BLANK ROME COMISKY & MCCAULEY LLP
201 East Fifth Street
Suite 1700
Cincinnati, Ohio 45202
(513) 362-8703; FAX (513) 362-8787

5.    For the time period 1830 to present, identify all past owners/operators of the Boston Line. Please include in your response, but do not limit your response to, ownership and/or operation of the railroad tracks themselves, the railroad embankments, bridges, culverts, and any and all other property associated with ownership and/or operation of the railroad tracks. Please provide all documents relied upon in preparing this response.

RESPONSE:

APU objects to Request No. 5 on the grounds that it is vague, unclear and confusing. Subject to and without waiving the foregoing objections, APU's response to Request No. 5 is as follows:

Boston & Worcester Railroad Corporation
Address:     N/A
Legal Form:   Corporation. Established by enactment of Massachusetts Legislature in 1831.
Description:   Railroad

Boston & Albany Railroad Company
Address: N/A

BLANK ROME COMISKY & MCCAULEY LLP

Legal Form:   Corporation. Established by consolidation of the Boston & Worcester Corporation and the Western Railroad Corporation, as authorized by enactment of the Massachusetts Legislature in 1867. Mass. St. of 1867, c. 270.
Description:   Railroad. In 1899, the Boston & Albany Railroad Company was leased to the New York Central and Hudson River Railroad Company, for a period of 99 years, which lease was consented to by the Massachusetts Legislature. Mass. St. of 1900, c. 468.

New York Central & Hudson River Railroad Company
Address:            N/A
Legal Form:         Corporation. Formed by consolidation of the New York Central Railroad Company and Hudson River Railroad Company, pursuant to enactment of the New York Legislature in 1869. Chapter 917, N.Y. Laws of 1869 (vol. 2, page 2,399).
Description:        Railroad. In 1899, became lessee of the Boston & Albany Railroad Company for a period of 99 years.

New York Central Railroad Company (1913 -1968)
Address:            N/A
Legal Form:         Corporation. Formed in 1913 by consolidation of New York Central & Hudson River Railroad Company, the Lake Shore & Michigan Southern Railroad Company, and 9 other companies.
Description:   Railroad. Lessee of the Boston & Albany Railroad Company during period from 1914 to 1961. On April 3, 1961, Boston & Albany Railroad Company and three other railroad companies were merged into the New York Central Railroad Company.

Pennsylvania New York Central Transportation Company (1968 -1969)
Address:            N/A
Legal Form:         Corporation. Formed as the result of merger by the New York Central Railroad Company with the Pennsylvania Railroad Company, effective February 1, 1968.

On May 8, 1968, the Pennsylvania New York Central Transportation Company changed its name to the Penn Central Company.
Description:         Transportation Company.

Penn Central Transportation Company (1969 -1976)
Address:            N/A
Legal Form:         Corporation. On October 1, 1969, Penn Central Company implemented a Plan of Merger and Reorganization in conjunction with PCT Company and Penn Central Holding Company. The operating company to emerge from this merger/reorganization was the Penn Central Transportation Company, which became an operating subsidiary of Penn Central Holding Company.1

[1] Concurrently, Penn Central Holding Company changed its name to Penn Central Company.

BLANK ROME COMISKY & MCCAULEY LLP

RESPONSE:

APU objects to Request No. 8 on the grounds that it is unclear and confusing. Subject to and without waiving the foregoing objections, please see Responses No. 5 and 7, and documents submitted therewith.

9.    Describe the transfer of title and operations of the Boston Line from 1830 to present. Please include in your response, but do not limit your response to, title and operations transfers of the railroad tracks themselves, the railroad embankments, bridges, culverts, and any and all property associated with ownership of the railroad tracks.

RESPONSE:

APU objects to Request No. 9 on the grounds that it is vague, unclear and confusing. Subject to and without waiving the foregoing objections, APU's response to Request No. 9 is as follows:

Boston & Worcester Rail Road was established by enactment of the Massachusetts legislature in 1831, which authorized construction of a railroad between the cities of Boston and Worcester. The portion of the rail line in the vicinity of Morse's Pond (referred to in EPA's Request for Information as "Boston Line") is believed to have been completed in or around 1835. In 1867, again by statutory enactment, the Boston & Worcester and Western Rail Roads were consolidated into the Boston & Albany Railroad. In 1899, Boston & Albany leased the Boston Line to the New York Central & Hudson Rail Road for a term of 99 years. This lease interest, however, terminated in 1961 by merger of Boston & Albany into the New York Central Railroad. See also APU's Response to U.S. EPA Section 104(e) Request for Information Number 5, which response is dated June 16, 2000. APU continues to review historical documents to determine further details regarding the foregoing transactions.

10.    What is the relationship between American Premier Underwriters, Inc. and each of the following companies? Provide all documents relied upon in preparing this response, including, but not limited to, any and all documents relevant to this question which were used, or relied upon, in the course of any and all litigation between American Premier Underwriters, Inc. and Penn Central Transportation Company's insurance carriers from 1990 to the present (inclusive).

> a.    the Boston and Worcester Rail Road Company;
> b.    the Western Railroad Company;
> c.    the Boston and Albany Railroad Company;
> d.    the New York Central and Hudson River Railroad Company; and
> e.    the New York Central Railroad Company.

BLANK ROME COMISKY & McCAULEY LLP

Respectfully submitted,

*Jonathan A. Conte*

Jonathan A. Conte, Esq.
BLANK ROME
201 East Fifth Street
Suite 1700
Cincinnati, Ohio 45202

Attachments

cc:    U.S. Environmental Protection Agency
       Sharon C. Fennelly, Enforcement Coordinator
       Office of Site Remediation and Restoration
       One Congress Street, Mail Code HBR
       Boston, MA 02114-2023

## DECLARATION

I declare under penalty of perjury that I am authorized to respond on behalf of

American Premier Underwriters, Inc., and that the forgoing is complete, true and correct,

to the best of my knowledge and belief.

Executed on _____April 25_____ , 2002

*Jonathan A. Conte*

Jonathan A. Conte

# Exhibit 10

# CSX
**TRANSPORTATION**

Law Department
500 Water Street
Speed Code J-150
Jacksonville, FL 32202
Fax (904) 359-7518
Telephone (904) 359-3100

**Pamela Savage Korchun**
Senior Counsel
Admitted in the District
of Columbia and Georgia.
Not admitted in Florida.

Writer's direct telephone line:

(904) 366-4228

E-Mail: Pam_Korchun@CSX.com

April 19, 2000

**_Via Airborne Express - Overnight Delivery_**

Sharon C. Fennelly
Enforcement Coordinator
Site Evaluation and Response II
U.S. Environmental Protection Agency
1 Congress Street, Suite 1100 (HBR)
Boston, MA 02114-2023

> *Re:*   *Morse's Pond Site, Wellesley, Massachusetts*
> *EPA 104(e) Information Request*

Dear Ms. Fennelly:

   This constitutes the response of CSX Transportation, Inc. ("CSXT") to EPA's Information Request dated February 9, 2000 with regard to the above-referenced Site. CSXT appreciates the extension of time to respond until April 21, 2000 which was kindly provided by Mr. Greg Dain.

   In response to your Agency's request, we have made reasonable inquiry and conducted a diligent search of currently available company records and, based on the results of those efforts, responses are made on the enclosed form and supplemented in this cover letter.

   The responses provided pursuant to the Information Request are not intended and should not be construed as an admission of liability by CSXT for the release or threatened release of hazardous substances at the Morse's Pond Site, or for any removal, response, costs or damages attributable to hazardous substances at that Site. CSXT specifically denies any liability under CERCLA of any other statute, regulation or common law for the release or threat of release of hazardous substances at the Site.

   In general, CSXT has uncovered no records or other information demonstrating that it provided rail transportation of materials to the Morse's Pond Site. In addition, CSXT has uncovered no records or other information which would indicate that it owns or operates the Morse's Pond Site, or generated or was involved in the transport, treatment, storage or disposal of any hazardous substances at the Morse's Pond Site. Finally, CSXT is not and never has been an "owner" or "operator" of the Morse's Pond Site within the meaning of CERCLA. An explanation of CSXT's status with regard to the rail line adjacent to the Morse's Pond Site is explained below and incorporated by reference in the Answers CSXT is providing on the attached form.

Sharon C. Fennelly
U.S. Environmental Protection Agency
Page 2
April 19, 2000

*Re:    Morse's Pond Site, Wellesley, Massachusetts - EPA 104(e) Information Request*

## Background

As you are aware, CSXT is a freight railroad engaged in the transportation of goods by rail principally in the Eastern United States and Canada. CSXT currently operates a rail system of approximately 32,000 miles spanning 23 states, the District of Columbia and Canada. On June 10, 1997, CSX Corporation and its operating subsidiary, CSXT (collectively, "CSX"), entered into a "Transaction Agreement" with Norfolk Southern Corporation and its operating subsidiary, Norfolk Southern Railway Co. ("NSR") (collectively, "NS"); Conrail, Inc. and its operating subsidiary Consolidated Rail Corporation (collectively, "Conrail"); and CRR Holdings LLC (a newly formed entity owned by CSX and NS).

CSX and NS each operate major freight railroads in the Eastern United States. The Transaction Agreement was intended to document the agreement pursuant to which CSX and NS would acquire Conrail, another major freight railroad in the Eastern United States, and divide most of its assets for operation between them, with CSX obtaining a 42% equity interest in Conrail and a 42% share of Conrail's assets, and NS obtaining a 58% interest.

Conrail was formed in 1976 out of several bankrupt Northeastern railroads, including the Penn Central Company ("Penn Central"). Penn Central was the successor to several Northeastern roads, most importantly the Pennsylvania Railroad and the New York Central Railroad. (Conrail was originally majority-owned by the United States Government but its shares were sold to the public in 1987.) After its formation in 1976, Conrail was effectively the only freight rail carrier in much of the Northeast.

The Transaction Agreement provided for a division of Conrail's assets whereby a large portion was placed in an operating subsidiary of Conrail to be known as the "New York Central Lines LLC" ("NYC"), and a large portion would be placed in an operating subsidiary to be known as the "Pennsylvania Lines LLC" ("PRR"). Conrail Assets which were allocated between NYC and PRR included not only rail lines owned by Conrail, but also trackage rights Conrail held on rail lines owned by other railroads. Trackage rights agreements are very common amongst railroads and allow a railroad to operate over lines owned by another railroad under various conditions contained in the various trackage agreements.

Sharon C. Fennelly
U.S. Environmental Protection Agency
Page 2
April 19, 2000

Re:    *Morse's Pond Site, Wellesley, Massachusetts - EPA 104(e) Information*
*Request*

Pursuant to Operating Agreements between CSXT and NYC and between NSR and PRR, CSXT has the exclusive right to manage and operate, for its own account, the NYC assets, while NSR has the exclusive right to manage and operate the PRR assets for its own account. A relatively small portion of Conrail's assets, largely located in New Jersey, Philadelphia, and the Detroit area, remained in Conrail, which subsists and operates those remaining assets as part of a "Shared Assets Area" for the benefit of both CSXT and NSR. As explained by the Surface Transportation Board ("STB") in its decision approving the acquisition of Conrail by CSXT and NSR, the Conrail assets conveyed to NYC and PRR and operated by CSXT and NSR, respectively, were intended to be used and enjoyed by CSXT and NSR "as if the carriers were Conrail." STB Finance Docket No. 33388. The NYC and PRR entities, and the routes and other assets which they possess, represent a territorial division of the bulk of Conrail's assets between CSXT and NSR, and are intended to extend the geographic and commercial reach of their respective rail networks.

The acquisition of Conrail by CSX and NS was subject to approval by the STB. The transaction was approved by the STB on July 23, 1998, effective August 22, 1998, after extensive proceedings in which other railroads, shippers, passenger agencies and others had, and exercised, opportunity to comment and object. Decision No. 86, STB Finance Docket No. 33388, decided July 20, 1998. The "Closing Date", the date by which all Conrail assets were allocated and all other conditions set forth in the Transaction Agreement for actual independent operation of the NYC and PRR entities were met, was June 1, 1999. The Transaction Agreement deals with the allocation of Conrail's assets in some detail, laying out in Schedule 1 thereto a listing of assets placed into NYC and PRR, and those retained by Conrail.

One of the Conrail assets allocated to NYC as of June 1, 1999 is the rights and obligations of Conrail set forth in the July 1, 1985 Trackage Rights Agreement between Conrail and the Massachusetts Bay Transit Authority ("MBTA") as they apply to the MBTA-owned rail line adjacent to the Morse's Pond Site. This document is lengthy and detailed and addresses trackage rights of each railroad on numerous segments of tracks owned by the other railroad, only one of which is the stretch of MBTA-owned track running adjacent to the Morse's Pond Site.

This Trackage Rights Agreement arose out of the sale in 1973 to the MBTA by the Trustees of the property of the Penn Central in proceedings in reorganization of certain rail lines then owned by Penn Central. In conveying the rail lines to the MBTA, including the Boston Line which runs adjacent to the Site, Penn Central reserved to themselves, their successors and assigns, "the right and easement, hereinafter referred to as the transportation easement, to use such portions of the premises herein granted, together with the existing buildings, structures, railroad track, facilities and appurtenances thereon as may be necessary, as shall be mutually agreed upon between the parties, for transportation

Sharon C. Fennelly
U.S. Environmental Protection Agency
Page 2
April 19, 2000

Re:   *Morse's Pond Site, Wellesley, Massachusetts - EPA 104(e) Information*
*Request*

purposes, in common with [MBTA's] use thereof." In 1976, pursuant to the terms of the Regional Reorganization Act of 1973 and the Final System Plan adopted by the United States Railway Association and approved pursuant to that Act, as amended, the Penn Central conveyed to Conrail all of Penn Central's rights and obligations under the conveyance described above to the MBTA. Thus, the Trackage Rights Agreement was negotiated by Conrail and the MBTA to implement the right conveyed to Conrail by Penn Central which Penn Central had retained upon its sale of the rail line to the MBTA to allow it to continue to use that rail line. As a result of the acquisition of Conrail by CSXT and NSR, these rights were then conveyed to NYC and are now used and managed by CSXT for its benefit.

CSXT's interest in the rail line in question is solely that of a transporter and manager of freight transportation along rail lines it does not own. CSXT also does not own the right to use the tracks or the Trackage Rights Agreement pertaining to that use. Instead, CSXT uses and manager those trackage rights for its own benefit. While CSXT may perform certain track maintenance, train dispatching and safety activities for this line, its "control" of this line is limited by the MBTA, the owner of the line, as set forth in the Trackage Rights Agreement. For example, among other things, the MBTA transports passengers on the line, the MBTA specifies dispatching priorities which CSXT must follow (§4.03), and the MBTA specifies certain maintenance requirements with which CSXT must comply (§5.04). The rail industry is replete with Trackage Rights Agreements and these arrangements simply do not arise to "ownership" interests in a line by the trackage rights holder. Moreover, consistent with caselaw supporting the premise that a mere easement holder should not be held responsible for cleanup costs, CSXT should not be held responsible for cleanup costs simply because it currently operates a rail line adjacent to the Morse's Pond Site. Long Beach Unified School District v. Dorothy B. Godwin Living Trust, et al., 32 F 3d 1264 (9th Cir. 1994); Grand Trunk Western Railroad Co. v. Acme Belt Recoating, Inc., et al., 859 F. Supp. 1125 (W. Dist. Mich., S. Div. 8/12/94).

Should you have any questions, please do not hesitate to call.

Very truly yours,

Pamela S. Korchun
Senior Counsel

PSK/dam

**Question 9:**   Describe any and all additions, demolitions or changes of any kind to physical structures on, under or about the Site, or to the property itself (e.g., excavation work) and state the dates on which such changes occurred.

**Answer:**   CSXT has engaged in no such work in managing train operations and running trains pursuant to the Trackage Rights Agreement, along the rail line running adjacent to the Morse's Pond Site. Attached are documents describing certain maintenance activities on the MBTA-owned tracks performed by Conrail prior to operation and management of the Trackage Rights Agreement by CSXT. CSXT further notes that the Trackage Rights Agreement also describes certain construction activities expected to be performed on the Boston Line by Conrail prior to 1989. In addition, CSXT is aware of (1) a U.S. Sprint fiber optic cable which runs along the rail right-of-way pursuant to an agreement dated August 10, 1984; (2) an agreement dated January 10, 2968 for crossing warning signs at Washington Street; and (3) a Railroad Valuation Map reference to an April 14, 1938 agreement with the Town of Wellesley for a pole line encroachment. The Fiber Optic Cable Agreement is subject to confidentiality restrictions and therefore a copy has not been provided in the absence of further demand by EPA. Finally, CSXT notes that certain investigatory and other responsive activities, including the taking of soil samples, has been performed by EPA and MADEP in the rail right-of-way.

**Question 10:**   Identify all prior lessees of the portion(s) of the Site for which CSX Transportation now or in the past has or has had a lease. For each prior lessee, further identify:

   a.   The dates of their leases.

   b.   All evidence that hazardous materials were released or threatened to be released at the Site during the period that they leased any portion of the Site.

**Answer:**   As more fully explained in the cover letter to these Answers, CSXT does not have and never has had a lease for any portion of the Morse's Pond Site or for the MBTA-owned rail line adjacent to the Morse's Pond Site.

**Question 11:**   Did you enter into a lease for any portion of the Site after the disposal or placement of the hazardous substances on, in, or at the Site? Describe all of the facts on which you base the Answer to the preceding question.

**Answer:**   See Answer to Question No. 10.

# RUBIN AND RUDMAN LLP

### COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Robin Patrick Daniels
Direct Dial: (617) 330-7087
rdaniels@rubinrudman.com

### BY FAX NUMBER (518)-767-6359

January 6, 1999

Greg Mellish
Assistant Division Engineer
Conrail
One Bell Crossing Road
Selkirk, New York 12158

Re:    DEP Request for Information to the MBTA;
       Morse's Pond Culvert Site, Wellesley, Massachusetts

*Boston Line*
*Wellesley*

Dear Greg:

Thank you for taking the time to speak to me this morning about the above matter.  As I explained, we are counsel to the MBTA with respect to DEP's Request for Information ("Request for Information") concerning the so-called Morse's Pond Culvert Site in Wellesley, Massachusetts.  I have enclosed a copy of the Request for Information for your review.  As I also explained, it is DEP's position that the MBTA is liable for, and therefore must remediate, the contaminated soil that apparently exists in the railbed in the area of the culvert.  The MBTA has taken the position that it is not liable for this contamination because the MBTA is entitled to the right-of-way defense contained in Massachusetts General Laws Chapter 21E.  In essence, that defense states that government agency, such as the MBTA, is not responsible for contamination in a right-of-way if the contamination occurred before the time the party acquired the right-of-way and the party had no knowledge of the contamination at the time it acquired the right-of-way.  It is the MBTA's position that the contamination, if any, that exists at the Morse's Pond Culvert Site was present on January 17, 1973, the date upon which the MBTA purchased the line from Penn Central Transportation Company ("Penn Central") in connection with Penn Central's bankruptcy reorganization proceedings.

DEP has issued the Request for Information in an effort to test the validity of the MBTA's

ROBIN AND RUDMAN LLP

Greg Mellish
January 6, 1999
Page 2

defense to liability.  As you can see from the Request for Information, DEP is looking for, in part, a description of all construction and maintenance activities performed at or in the immediate vicinity of the Morse's Pond Culvert.  It is my understanding that Conrail performs the maintenance on this line pursuant to a contract with the MBTA.  Accordingly, I will need your help answering questions 2, 3, 4 and 6.

Once you have had an opportunity to review the enclosed, please call me so that we can discuss it in more detail.  Again, the MBTA and I appreciate your assistance with this matter.

Very truly yours,

Robin Patrick Daniels

Cc:     Michael K. Crossen, Esquire
        Andrew D. Brennan
        Debra Darby

*[Handwritten margin notes:]* Send to Janet Acagnello 215-209-4817 333-4817 333-5021 Phone 333-5021 12 pages including cover

# RUBIN AND RUDMAN LLP

Counsellors at Law
50 Rowes Wharf
Boston, Massachusetts 02110
Telephone: (617) 330-7000
Telecopier: (617) 439-9556

FOUNDED 1920

## FACSIMILE TRANSMITTAL FORM

Date: **January 6, 1999**          Sender's Name: **Robin Daniels**

Receiving Party Telephone: **518 - 767 - 6221**

Receiving Party Telecopier: **518 - 767 - 6359**

Please Deliver To: **Greg Mellish**

Number of Pages to Follow: _____

Client #: **4853**          Matter #: **8**

Note:   If you have a question or problem regarding this transmission, please call (617) 330-7053

[ ] Original will follow
[√] Original will not follow

MESSAGE:

*[Handwritten:]* Albany Main Line

Greg Mellish
Div. Engineer — Albany
245-6221
→ heard something about paint
MBTA owns, CR maintains
under RR B - MBTA
& CR operate trains on line

"This telecopy is attorney-client privileged and contains confidential information intended only for the person(s) named above. Any other distribution, copying or disclosure is strictly prohibited. If you have received this telecopy in error, please notify us immediately by telephone, and return the original transmission to us at our expense."



COUNSEL
817 (FAX)

January 26, 1999

TELECOPIER AND FIRST
CLASS MAIL

Robin Daniels, Esquire
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

     Re:    Morse's Pond Culvert Site, Wellesley, MA

Dear Ms. Daniels:

This is in response to your letter to Greg Mellish dated January 6, 1999 concerning the above-referenced Site.

As far as Conrail is able to determine, the Site is located in the vicinity of the Boston Line, Milepost 16.01. Conrail's records show that track maintenance has occurred there as follows:

        1997:  Track No. 1, tie replacement and resurfacing

        1995:  Track No. 2, tie replacement and resurfacing

        1985:  Track No. 1, rail replacement

        1978:  Track No. 2, rail replacement

Resurfacing is a process in which machinery is used to raise the rails and ties and compact the ground beneath.

Ties are replaced approximately every ten years and resurfacing occurs approximately every four to five years. Replacement of rails is performed as necessary and not at any regular time interval.

Feel free to call me if you have any further questions regarding maintenance on the Boston Line.

Sincerely,

Rodney B. Griffith

RBG/tms

# Exhibit 11

# RUBIN and RUDMAN LLP

COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Michael K. Crossen
Direct Dial: (617) 330-7066

<u>BY HAND</u>

March 16, 2000

Gregory Dain, Esq.
U.S.EPA
Office of Environmental Stewardship
One Congress Street
Suite 1100
Boston, MA 02114-2023

*Re:    EPA Request For Information Morses Pond Site, Wellesley, MA*

Dear Mr. Dain:

This firm is counsel to the Massachusetts Bay Transportation Authority ("MBTA") with respect to the above matter. By letter dated February 9, 2000, the United States Environmental Protection Agency ("EPA") issued to the MBTA a Request for Information ("RFI") pursuant to 42 U.S.C. § 9604(e)(2) regarding the above-referenced site. Pursuant to our conversations last week and yesterday, the MBTA was given an extension until today to respond to the RFI. This letter and Attachment 1 hereto shall serve as the MBTA's response to the RFI. As we discussed yesterday, the MBTA's response is being delivered directly to you.

EPA's letter states that EPA is conducting an investigation that "requires inquiry into the identification, nature, and quantity of materials that have been or are generated, treated, stored, or disposed of at the Site or transported to the Site." CERCLA § 104(e)(2) specifically prescribes the information that EPA may require in an RFI. Subsection 104(e)(2) provides in pertinent part:

**(2)    Access to information**

Any officer, employee, or representative described in paragraph (1) may require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:

407351_2

RUBIN AND RUDMAN LLP

Gregory Dain, Esq.
March 16, 2000
Page 2

> (A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.
>
> (B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.
>
> (C) Information relating to the ability of a person to pay for or to perform a cleanup.

The MBTA objects to Request Nos. 4, 19, and 20 on the grounds that these requests exceed EPA's authority under CERCLA § 104(e)(2) and the scope of this investigation as set forth in EPA's letter of February 7, 2000. The bases of the MBTA's objections are discussed below and are incorporated and made part of Attachment 1 hereto.

Although the MBTA objects in the context of the RFI to providing documents and information that support its position that the MBTA is excluded from the definition of "owner or operator" pursuant to section 101(20)(D) of CERCLA because it acquired ownership involuntarily through bankruptcy, it is committed to working cooperatively with EPA to provide this information in a comprehensive and timely manner. Without waiving its objections under the RFI, the MBTA expects to submit a memorandum with supporting documentation to EPA shortly on this.

Request No. 4, which tracks the language of CERCLA § 107(b)(3),[1] seeks to compel the MBTA to disclose all information concerning its "third party defense." The MBTA does not object to the first part of Request No. 4, concerning acts or omissions of persons that caused the release of hazardous substances since this goes to the identification of materials and the nature or extent of a release. However, it does object to subparts (a) and (b) of this request. These

---

[1] CERCLA § 107(b) provides in part:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . .

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . .

407351_2

RUBIN AND RUDMAN LLP

Gregory Dain, Esq.
March 16, 2000
Page 4


documentation, including the Bankruptcy Court order, to EPA shortly in support of its assertion
that it falls within CERCLA § 101(20)(D).

Please do not hesitate to call me if you have any questions.


Very truly yours,

*Michael K. Crossen,Jr.*

Michael K. Crossen

*Margaret Van Deusen*

Margaret Van Deusen


Enc.

cc:    Andrew Brennan


407351_2

*Request No. 8.*

*Identify the current owner. State the dates which the current owner owned, operated or leased any portion of the Site and provide copies of all documents evidencing or relating to such ownership, operation or lease, including but not limited to purchase and sale agreements, deeds, leases, etc.*

Response No. 8:

Based on CERCLA's definition of "facility" to be "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed *or otherwise come to be located*," (emphasis added), the MBTA is one of the current owners of the facility. Other owners are Kendrick and Debra Brede, One Bacon Street, Wellesley, and the Town of Wellesley.

On January 17, 1973, the MBTA received certain property of Penn Central Transportation Company ("Penn Central") in connection with Penn Central's bankruptcy proceedings. This property included approximately 145 miles of railroad rights-of-way, buildings, track bridges, track, related track structures and signal systems, and specifically included a portion of the site. The MBTA took title through a deed was conveyed by George P. Baker, Richard C. Bond, and Jervis Langdon, Jr., as Bankruptcy Trustees of the property of the Penn Central. A copy of the deed is attached hereto at Tab 3. The MBTA took title to the Boston Main Line between Riverside and Framingham in the transfer, which includes a portion of the site. This portion of the site is referenced in Section D on page 2 of the deed. Specifically, it is included on Sheet 17 of the Valuation Plan entitled "Right of Way and Track Map Boston and Albany Railroad Operated by the New York Central Railroad Company as Lessee Main Line Scale: 1 "= 100' June 30, 1915 Office of Valuation Engineer Boston, Mass." A copy of Sheet 17 is also attached at Tab 3. There is also an "Order of Taking #68 by the MBTA-Haymarket-North Extension," dated June 11, 1975, a copy of which is attached hereto at Tab 3, together with a copy of the Right of Way and Track Map recorded with said taking. The MBTA will provide a copy of the agreement between Penn Central and the MBTA with its submission to EPA that will be submitted shortly discussing the applicability of the CERCLA § 101(20)(D) exclusion to the MBTA.

Pursuant to the Trackage Rights Agreement between the MBTA, effective July 1, 1985 (and still in effect), and Conrail (now CSX Transportation Company ("CSX")), ("the Agreement"), CSX operates and is responsible for the Boston Main Line between Riverside and Framingham, which includes a portion of the site. A copy of the Trackage Rights Agreement is attached hereto at Tab 3.

Of the other known site owners, the Bredes acquired the property at One Bacon Street in 1987 as tenants by the entirety. A copy of the deed is attached at Tab 5. The Town of Wellesley, acquired the property on the southeastern side of Morses Pond in 1931 from the Boston Ice Company through three separate deeds. Copies of the deeds are attached at Tab 5.

407351_2

*Request No. 9.*

> *Describe any and all additions, demolitions or changes of any kind to physical structures on, under or about the Site, or to the property itself (e.g., excavation work) and state the dates on which such changes occurred*

Response No. 9:

> The MBTA states that, to the best of its knowledge and information, no construction has occurred at the right-of- way during the time that the MBTA has been an owner. Moreover, all maintenance of the Boston Line, of which a portion of the site is a part, is the responsibility of CSX pursuant to the Trackage Rights Agreement between the MBTA and CSX. According to CSX, the following maintenance has occurred at the Property:
>
> a.    In 1997, tie replacement and resurfacing was performed on Track No. 1
>
> b.    In 1995, tie replacement and resurfacing was performed on Track No. 2;
>
> c.    In 1985, rail replacement was performed on Track No. 1; and
>
> d.    In 1978, rail replacement was performed on Track No. 2.
>
> Ties are replaced approximately every 10 years and resurfacing occurs approximately every 4 to 5 years. Replacement of rails is performed as necessary and not at any regular time intervals. A copy of the MBTA's response to DEP's RFI is attached at Tab 4.
>
> Additionally, DEP installed a fence around the site and in 1998, covered soil in the embankment area with geotextile fabric.

*Request No. 10.*

> *Identify all prior owners of the Site. For each prior owner, further identify:*
>
> a.    *The dates of their ownership.*
>
> b.    *All evidence that hazardous materials were released or threatened to be released at the Site during the period that they owned the Site.*

Response No. 10:

> The MBTA has no first-hand knowledge or documentary evidence of releases of hazardous materials by prior owners. However, see the MBTA's Response to Request

407351_2

Response No. 14:

> The MBTA has not undertaken any environmental assessments or investigations of the Site. The MBTA further states that it received the right-of-way in the vicinity of Morses Pond from Penn Central as part of a package of 145 miles of rights-of-way in Massachusetts.

*Request No. 15.*

> *When did you first learn of the contamination at the Site? At that time, and at all times from then to the present, what actions or measures did you take with respect to that contamination, e.g., remediation, containment, removal, transportation, etc ?*

Response No. 15:

> The MBTA first became aware of the contamination when it received a Notice of Responsibility issued by DEP on September 30, 1994. On June 18, 1996, DEP issued the MBTA a Notice of Response Action. By letter dated July 17, 1996, the MBTA responded to both the Notice of Responsibility and Notice of Response Action. In that letter, the MBTA set forth its position that it possessed no liability as a result of the "right-of-way defense" contained in M.G.L. c. 21 E, § 5(j). By letter dated November 18, 1998, DEP notified the MBTA of DEP's intention to conduct an Immediate Response Action ("IRA") and invited the MBTA to undertake the IRA. By letter dated December 1, 1998, the MBTA repeated its previously asserted defense to liability. By letter dated February 16, 2000, DEP notified the MBTA of its intention to conduct Response Action in which DEP "acknowledge[d] that MBTA has asserted and continues to assert a defense from liability under M.G.L. c. 21E section 5(j)." Copies of the above-referenced documents are reproduced at Tab 6.

*Request No. 16.*

> *Did you ever transport to the Site or use, purchase, generate, store, treat, dispose, or otherwise handle at the Site any materials? If the answer to the preceding question is anything but an unqualified "no," identify:*

> a.    *In general terms, the nature and quantity of the non-hazardous materials so transported, used, purchased, generated, stored, treated, disposed, or otherwise handled.*

> b.    *The chemical composition, characteristics, physical state (e.g., solid, liquid) of each hazardous material so transported, used, purchased, generated, stored, treated, disposed, or otherwise handled.*

> c.    *The persons who supplied you with each such hazardous material.*

# Exhibit 12

632

KNOW ALL MEN BY THESE PRESENTS:

We, GEORGE P. BAKER, RICHARD C. BOND, and JERVIS LANGDON, JR., Trustees of the property of the Penn Central Transportation Company, In Proceedings for the Reorganization of a Railroad entitled: "In the Matter of Penn Central Transportation Company, Debtor", No. 70-347, in the United States District Court for the Eastern District of Pennsylvania (Grantors), acting herein pursuant to the authority vested in us by Orders Nos. 20, 867 and 1065 in said proceedings, for the consideration of Nineteen Million Five Hundred Thousand Dollars ($19,500,000), the receipt of which is hereby acknowledged, GRANT to the MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, a body politic and corporate and a political sub-division of the COMMONWEALTH OF MASSACHUSETTS, established under the provisions of Chapter 161A of the General Laws, inserted by Section 18 of Chapter 563 of the Acts of 1964 (Grantee), free of all liens and encumbrances, subject only to existing leases, licenses and agreements recorded prior to February 3, 1972, all of our right, title and interest in and to certain property of the Grantors, including interests in land, buildings, track bridges, excluding those bridges within the purview of Chapter 634 of the Massachusetts Acts of 1971, all track and related track structures and the signal system and related facilities, consisting of:

(A)  The properties of the former Boston and Providence Railroad Company located in the Commonwealth of Massachusetts;

(B)  Certain branch lines of railroad of the former New York, New Haven and Hartford Railroad Company; a portion of the abandoned former New York, New Haven and Hartford Railroad Company branch line from Easton to Whittenton Junction; the station facilities and land at Route 128 Station in the Towns of Dedham and Westwood;

(C)  Certain parcels of land originally acquired in the name of the former New York, New Haven and Hartford Railroad Company;

-2-

(D) The former Boston & Albany main line between
Riverside and Framingham, Massachusetts, together with a portion
of the Newton Lower Falls Branch Line beginning at Station 519 +
20 and extending southwesterly 2,040 feet to Route 128.

All of the aforesaid property hereby granted is described
in Schedule "A" attached hereto and made a part hereof and is
shown in red outline on a series of Valuation Plans made a part
hereto, entitled:

"Right Of Way And Track Map (Boston And Providence
R.R. Corp.) (Old Colony R.R. Co.) (The New York New Haven
And Hartford R.R. Co.) Operated by The New York New Haven
And Hartford R.R. Co., Scale: 1" = 100 Ft. Date June 30,
1915 Office Of Valuation Engineer, Boston, Mass." and
numbered as follows:

| | |
|---|---|
| V 3.10 through V 3.17 | Sheets 4 through 41-1/2, Sheet 31 excluded. |
| V 3.18 (3.18)1.1(1) | |
| V 3.19 through V 3.20 | Sheets 1 through 6 |
| V 3.21 | Sheets 1 through 5 |
| V 3.22 | Sheets 1 through 4 |
| V 4.11 through V 4.17 | Sheets 11.1, 11.2 through 29 |
| V 4.26 | Sheets 1 through 4 |
| V 4.27 through V 4.29 | Sheets 1 through 15 including 1A and 1B |
| V 5.15 through V 5.19 | Sheets 12 through 37 |
| V 5.31 through V 5.32 | Sheets 1 through 11 |
| V 5.43 | Sheets 1 and 2 |
| V 5.44 through V 5.45 | Sheets 8 through 18 |
| V 7.22 | Sheets 1 and 2 |

and on a certain set of Valuation Plans entitled:

"Right Of Way And Track Map Boston And Albany Rail-
road Operated By The New York Central Railroad Company
As Lessee Main Line Scale: 1" = 100' June 30, 1915 Office
of Valuation Engineer Boston, Mass." and numbered V 1
Sheets 11 through 22.

Said Plans, showing the property granted within each County, are
recorded herewith in the Registry of Deeds of the appropriate
County.

4907

634                              -3-

Reserving from this grant, however, to the Grantors,
their successors and assigns, the right and easement, hereinafter
referred to as the transportation easement, to use such portions
of the premises herein granted, together with the existing
buildings, structures, railroad track, facilities and appurtenances
thereon as may be necessary, as shall be mutually agreed upon
between the parties, for transportation purposes, in common with
Grantee's use thereof. Freight service conducted on the
transportation easement reserved on the portion of the former
Boston and Providence Railroad Company main line between
Valuation Station 2267 + 00 in Boston and Valuation Station 1810 +
00 in Readville shall be limited to the use of a single track
from which Grantors will be able to continue service solely to
existing receivers of freight on said portion of said line.
Grantors shall have the right to use the existing track system
for purposes of required crossovers for such freight service.
Any change in the existing crossover system made by the Grantee
shall be at the expense of the Grantee as provided hereinafter.
To the extent that use of the easement reserved herein may be
reduced either by discontinuance of passenger service or by an
abandonment of freight service, then the easement reserved may
be limited to the minimum required trackage as may be mutually
agreed upon.

The transportation easement reserved on the remaining
lines of former Boston and Providence Railroad Company and on the
other branch line rights of way shall be the minimum adequate to
enable Grantors to carry out their obligations to shippers and
receivers on the said main lines and branch line rights of way on
a track or tracks to be mutually agreed upon between the parties.
To the extent that passenger services on said main lines or
branch line rights of way are presently being conducted the
transportation easement shall also be the minimum adequate to
operate such service so long as it continues.

-4-

The transportation easement reserved on the main line of the former Boston and Providence Railroad Company includes the right to operate passenger trains for the account of "Amtrak," so-called, and Grantors are obligated under their agreement with "Amtrak" to preserve, until July 1, 1973, the use of said main lines for the purposes of providing Inter-City Passenger Service. The transportation easement so far as it relates to this "Amtrak" service shall terminate on July 1, 1973 unless (a) the "Amtrak" agreement is extended or (b) Grantors are required by law or an order of a regulatory agency to continue Inter-City Passenger Service. In the event of such continuance of service, the transportation easement shall continue subject to terms and conditions to be agreed upon by the parties or their successors. The transportation easement reserved shall terminate as to any portion or portions thereof when and if Grantors obtain from any regulatory agency having jurisdiction a certificate permitting of abandonment of operations over any such portion or portions.

The transportation easement reserved herein does not include the right to participate in the proceeds from any development of the air rights over said easement and said easement is intended to permit Grantors to operate thereon for transportation purposes.

Grantors further reserve to themselves, their successors and assigns, the right and easement to use, maintain, replace renew, or install poles, pipes, wires and appurtenances within the scope of the Grantors' easement.

Grantors and Grantee agree that on certain of the rights of way granted, joint use of those rights of way may be feasible and desirable. Grantors and Grantee agree that the use reserved by Grantors with respect to those rights of way may be limited by time or usage to enable Grantee to enjoy use of said rights of way for rapid transit or other purposes. In the event of such

4907

636                                            -5-

joint use, separate operating agreements shall be negotiated
between Grantee and Grantors. In the event that Grantee desires
exclusive use of any portion or portions of the properties
subject to the easement reserved herein, free of the said ease-
ment, Grantors, at Grantee's sole cost and expense, shall modify
their operations in accordance with plans and contracts approved
by the Chief Engineer of Grantors at such locations as may be
mutually agreed upon between the parties. Said approval of the
Chief Engineer shall not be unreasonably withheld.

Grantee agrees that any air rights development will not
interfere with Grantors' free and uninterrupted use of the
transportation easement reserved and agrees to submit plans of
any such development over said easement for approval by Grantors'
Chief Engineer to the extent said development affects such
easement, which approval shall not be unreasonably withheld.

Grantors agree to bear the cost of necessary maintenance,
repair and alteration of all buildings, structures, tracks,
facilities and appurtenances, used solely by Grantors. If Grantors
and Grantee use any of the premises jointly then Grantee shall
assume the obligations of this covenant to the extent of such
joint use, provided, however, that neither party shall be obligated
to pay more than the amount which would have been required had
there been a separate rather than a joint use. Grantors and
Grantee agree that the maintenance, repair and alteration covenant
assumed herein may require Grantors to provide, from time to
time, material, which in accordance with sound accounting principles
is chargeable to capital account. With respect to such material
provided by Grantors, Grantors shall retain the right to remove
it upon the abandonment of the transportation easement reserved,
provided that the usefulness of the premises is not impaired.
Without limiting the generality of the foregoing, items charge-
able to capital account shall include heavier rail than that
on the premises at the closing date, welded rail and new signal

-6-

systems or their appurtenances.

Grantors agree that at such time or times as they obtain
a certificate of abandonment of the transportation easement, or
any portion or portions thereof, or if they in fact cease to
use the said easement, then the said easement shall to the same
extent terminate and Grantors shall execute upon the request of
Grantee an appropriate release of said easement.

Said premises are granted subject to conditions of title
and to leases, licenses and agreements of the Grantors applicable
to the granted premises in effect and recorded prior to February
3, 1972; and for consideration of the aforesaid, the Grantors,
insofar as they lawfully may, do hereby assign to Grantee all
of their rights and privileges applicable to the granted premises,
except that the existing agreements between Grantors and
Massachusetts Bay Transportation Authority and Grantor and "Amtrak"
or any extension thereof are not included herein, and it is
further agreed that in lieu of any real estate tax apportionment
with regard to the property hereunder, the income from said
property shall be retained by Grantor for the calendar year 1972
and applied to the payment of Massachusetts real estate taxes
as ordered by the Reorganization Court.

All of the terms and provisions of this grant shall bind
and inure to the benefit of the parties hereto and their
respective heirs, legal representatives, successors and assigns
forever.

In order to facilitate the recording of this deed it
has been executed in several counterparts, each of which shall
be deemed to be an original and all of which together shall
constitute one and the same instrument.

The Massachusetts deed excise tax stamps required in con-
nection with the grant hereby made have been affixed to the

658                                          -7-

counterpart hereof to be recorded with Suffolk County Registry of Deeds.

IN WITNESS WHEREOF, we, George P. Baker, Richard C. Bond and Jervis Langdon, Jr., Trustees of the Property of Penn Central Transportation Company, Debtor, have hereunto set our hands and seals this *17th* day of *January*, 1973.

SIGNED, SEALED and DELIVERED
in the presence of:

_____    _____
                                     George P. Baker, Trustee

_____    _____
_____     Richard C. Bond, Trustee

                                     _____
                                     Jervis Langdon, Jr., Trustee


                    COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                  Boston, January 17 1973

        Then personally appeared the above-named George P. Baker and acknowledged the foregoing instrument to be his free act and deed, before me.

                                     _____
                                     Richard J. Ferriter
                                     Notary Public
                                     My Commission Expires:
                                     November 26, 1976



COMMONWEALTH OF PENNSYLVANIA  )
                              :  ss   Philadelphia, Pa. *January 22,* 1973
COUNTY OF PHILADELPHIA        )

        Then personally appeared the above-named Richard C. Bond and Jervis Langdon, Jr. and acknowledged the foregoing instrument to be their free act and deed, before me.

                                     _____
                                     Notary Public
                                     WILLIAM J. O'NEILL
                                     Notary Public, Philadelphia, Philadelphia Co.
                                     My Commission Expires June 26, 1976

SCHEDULE A

(A)  The property comprising the main line right of way of the
former Boston and Providence Railroad Company, beginning in Boston
and extending in a generally southwesterly direction through Roxbury,
Jamaica Plain, Forest Hills, Mount Hope, Clarendon Hills, Hazelwood,
Readville, in Suffolk County, and continuing thence in a southwesterly
direction through Dedham, Canton, Westwood, Sharon, Sharon Heights,
Foxboro, East Foxboro, in Norfolk County, and continuing thence in a
southwesterly direction through Mansfield, West Mansfield and
Attleboro at the boundary line between the Commonwealth of Massachu-
setts and the State of Rhode Island in Bristol County.

The former Boston and Providence Railroad Company East
Junction Branch Line from East Junction in the City of Attleboro to
the boundary line between the Commonwealth of Massachusetts and the
State of Rhode Island in the City of Seekonk, all located in Bristol
County.

The former Boston and Providence Railroad Company Dedham
Branch Line, beginning in Boston, Suffolk County, and extending to
Dedham, Norfolk County.

The former Boston and Providence Railroad Company Branch
Line between Forest Hills and West Roxbury, all located in Suffolk
County.

The former Boston and Providence Railroad Company Branch
Line from Canton to Stoughton, all in the County of Norfolk.

The former Boston and Providence Railroad Company Branch
Line from West Roxbury in Suffolk County to Dedham in Norfolk County.

(B)  The former New York, New Haven and Hartford Railroad Company
Branch Line, beginning at Stoughton, Norfolk County, continuing
through Easton to Raynham in Bristol County, together with a portion
of the former New York, New Haven and Hartford Railroad Company
abandoned branch line between Easton and Whittenton Junction, Taunton,
all in Bristol County.

The former New York, New Haven and Hartford Railroad Company
Branch Line, beginning in West Roxbury, Suffolk County, to Needham,
Norfolk County.

The former New York, New Haven and Hartford Railroad Company
Branch Line from Cook Street in Newton, Middlesex County, through
Needham, Dedham, Dover, Medfield to Millis in Norfolk County.

The former New York, New Haven and Hartford Railroad Company
Branch Line between Braintree, Norfolk County, to Plymouth, Plymouth
County, passing through Weymouth, Abington, Whitman, Hanson, Halifax,
Plympton and Kingston.

*The former New York, New Haven and Hartford Railroad Company*
Branch Line between Readville and Franklin, beginning in Boston,
Suffolk County, running through Dedham, Westwood, Norwood, Walpole,
Norfolk to Franklin, Norfolk County.

The former New York, New Haven and Hartford Railroad Company
Branch Line between Braintree and Campello, beginning in Braintree,
running through Randolph, Holbrook and Avon, Norfolk County, continu-
ing thence to Brockton, Plymouth County.

(C)  Certain parcels of land originally acquired in the name of
the former New York, New Haven and Hartford Railroad Company located
within or immediately adjacent to the former Boston and Providence
Railroad Company main line between Valuation Stations 2267 + 00 and
305 + 13, included within the red outline on the plans made a part
of and filed with the deed granting the properties herein, as follows:

| Location | County | Val. map | Valuation CL Sta. | Area | |
|---|---|---|---|---|---|
| Boston | Suffolk | 11(317)41.1 41 1/2.1 (41.1 41 1/2.1) | 2215+0 | 100 sq. | ft. |
| " | " | " | 2216+50 | 2,000 | " " |
| Hyde Park | " | 11(315)34.1(34) | 1833+50 | 12,750 | " " |
| " " | " | 11(315)33.1(33) | 1800+0 | 3,750 | " " |
| Sharon | Norfolk | 11(3.13)21.1(21) | 1292+0 | 4,500 | " " |
| " | " | 11(3.13)19.1A(19-20) | 1234+0 | 4,350 | " " |
| " | " | " | 1223+0 | 5,200 | " " |
| " | " | 11(3.13)19.1(19) | 1210+0 | 40,850 | " " |
| E. Foxboro | " | 11(3.13)17.1(17) | 1070+0to1097+39 | 88,285 | " " |
| Foxboro | " | 11(3.13)16.1(16) | 1036+10to1070+31 | 95,640 | " " |
| " | " | " | 1030+0 | 22,110 | " " |
| Attleboro | Bristol | 11(3.12)9.1(9) | 660+0 | 21,780 | " " |
| " | " | 11(3.11)7.1(7) | 570+0 | 37,800 | " " |

| Location | County | Val. map | Valuation CL Sta. | Area |
|---|---|---|---|---|
| Seekonk | Bristol | 11(3.10) A (4) | 334+34.68(parcel)4) | 4,950 sq. ft. |
| Perrins Sta. | " | 11(3.10 B (5) | 380+0 | 7,500 " " |
| Attleboro | " | 10(3.11-12) A (8) | 612+0 | 10,260 " " |
| " | " | 10(3.11-12) A (8) | 625+0 | 4,200 " " |
| Foxboro | Norfolk | 10(3.13) C (18) | 1140+0 | 64,750 " " |
| East. Jct. | Bristol | 11(3.21-11)5.1(5) | 490+0 (par. 9) | 23,788 " " |

(D)  The former Boston and Albany main line between Riverside and
Framingham, beginning in Auburndale, Middlesex County, running through
Wellesley Farms, Wellesley Hills, Wellesley, Norfolk County, and con-
tinuing through Natick to Framingham in Middlesex County, together with
a portion of the Newton Lower Falls Branch Line, beginning at Station
519 + 20 and extending southwesterly 2,040 feet to Route 128, consist-
ing of approximately 163,500 square feet.

(E)  All of the lands of the Grantor situated in Walpole and
Canton as more specifically described in Certificates of Title Nos.
9388 and 90756, respectively, registered with the Registry District
of Norfolk County in Book 47, Page 188 and Book 454, Page 156,
respectively.

All of the aforesaid property granted within each County is
shown in red outline on a series of Valuation Plans recorded with the
deed granting the aforesaid property in the Registry of Deeds in the
appropriate County.

Recorded Jan. 26, 1973 at 4h. P.M.